BAKER v GENERAL MOTORS CORPORATION (AFTER REMAND)

COLLIER v GENERAL MOTORS CORPORATION (AFTER REMAND)

SEIDELL v GENERAL MOTORS CORPORATION (AFTER REMAND)

Docket Nos. 59861-59863. Argued June 9, 1983 (Calendar No. 3).—Decided December 28, 1984. Released January 17, 1985. Rehearing denied 422 Mich 1201.

A. G. Baker, Jr., Kenneth R. Collier, Robert J. Seidell, and other members of the United Auto Workers who were employees of General Motors Corporation were laid off because of work shortages resulting from strikes at General Motors plants other than those at which the plaintiffs worked by other members of the UAW. The Michigan Employment Security Commission approved the plaintiffs' claims for unemployment compensation. A hearing referee reversed on the ground that the plaintiffs had "financed" the labor dispute that caused their unemployment by paying emergency strike fund dues, and the Employment Security Appeal Board, predecessor of the Board of Review, affirmed the referee's decision. The Genesee Circuit Court, Thomas C. Yeotis, J., reversed in *Baker,* the Wayne Circuit Court, James N. Canham, J., reversed in *Collier,* and the Ingham Circuit Court, James T. Kallman, J., affirmed in *Seidell.* The Court of Appeals, T. M. Burns, P.J., and M. J. Kelly and D. F. Walsh, JJ., reversed the judgments of the Genesee and Wayne Circuit Courts and affirmed the judgment of the Ingham Circuit Court (Docket Nos. 24083, 24084, 24150).

The Supreme Court determined that the plaintiffs' unemploy-

REFERENCES FOR POINTS IN HEADNOTES

[1-9] 76 Am Jur 2d, Unemployment Compensation §§ 78, 80, 85.

General principles pertaining to statutory disqualification for unemployment compensation benefits because of strike or labor dispute. 63 ALR3d 88.

What constitutes participation or direct interest in, or financing of, labor dispute or strike within disqualification provisions of unemployment compensation acts. 62 ALR3d 314.

[2, 3, 7] 76 Am Jur 2d, Unemployment Compensation § 84.

[5-7, 9] 48 Am Jur 2d, Labor and Labor Relations §§ 263-267.

[8] 48 Am Jur 2d, Labor and Labor Relations § 9.

48A Am Jur 2d, Labor and Labor Relations § 2003.

ment was "due to a labor dispute in active progress," that the strike fund dues paid by the plaintiffs were extraordinary emergency dues and not regular dues, and that the payment of extraordinary dues did not automatically disqualify the plaintiffs from receiving unemployment compensation. The Court held that dues which would require disqualification must have a meaningful connection to the labor dispute that caused the unemployment. The case was remanded to the Board of Review to determine whether the dues were sufficiently connected with the dispute to amount to "financing" it. 409 Mich 639 (1980). On remand, the board found that a meaningful connection existed and denied the plaintiffs unemployment benefits.

After remand, the judgments of the Court of Appeals are affirmed by an equally divided Court.

Justice Ryan, joined by Justices Brickley and Cavanagh, stated that the plaintiffs were disqualified from receiving unemployment benefits because their dues financed the labor dispute that caused their unemployment and there was a meaningful connection between the financing and the dispute. The Employment Security Act does not violate the Supremacy Clause of the federal constitution or unconstitutionally burden the plaintiffs' First Amendment rights of association.

1. The Michigan Employment Security Act was enacted in response to the federal Social Security Act which provided for federal funding for states with unemployment insurance programs. Eligibility for unemployment benefits under the MESA is limited to persons who are involuntarily unemployed. Unemployment as a result of direct involvement in a labor dispute is voluntary unemployment. A worker is not eligible for unemployment benefits where unemployment results from a labor dispute in an establishment within the United States that is functionally integrated with the worker's place of employment and where the worker "financed," i.e., paid funds to strikers, and there is a meaningful connection between the financing and the unemployment.

2. A meaningful connection between financing a labor dispute and unemployment exists where the worker engages in financing labor disputes in significant amounts and at times proximately related to the dispute which caused the worker's unemployment. In order to find that a meaningful connection exists, it must be determined that the labor dispute that caused the worker's unemployment was financed in fact by the worker, that the dispute in question was foreseeably within the scope of the type of labor disputes that were financed, and that the worker's resulting unemployment was also foreseeable. The

purpose of the financing must be determined according to the facts as they appeared at the time of the financing and not by hindsight, and may be shown from statements of the worker or officials of a union that collected funds to support the strikers of which the worker is a member. Where financing is accomplished through an organization, the significance of the amount must be determined by reviewing the amount of the organization's program as well as individual contributions. Where non-ordinary dues are used by the organization to raise funds to finance the dispute, the amount of the non-ordinary dues must be compared with the amount of regular dues and the effect of the non-ordinary dues on the resources of the organization allocated to support the dispute and the actual role played by the non-ordinary dues must be examined to determine whether the amount of the non-ordinary dues is significant or *de minimis*. Finally, the financing and the dispute which caused the worker's unemployment must have followed upon one another in the light of the practical realities of the time needed to collect, transfer, and disburse the funds raised by the non-ordinary dues.

3. There need not be a direct transfer of funds from a worker to a striker for a meaningful connection to exist. Payments made by a worker to a union for the benefit of strikers may provide a meaningful connection that would disqualify the worker from receiving unemployment benefits. Workers and strikers need not share common interests and objectives for a meaningful connection to exist. Whether, and to what degree, a worker finances a labor dispute has no direct correlation with any benefit that may be derived from a successful dispute. Finally, the voluntariness of the funding is not relevant of whether a meaningful connection exists. A meaningful connection might exist where a contribution of a worker is forced and might not exist where voluntarily given. Voluntariness is relevant to disqualification, however.

4. In these cases, the plaintiffs are not eligible for unemployment benefits because they caused their unemployment by financing a labor dispute meaningfully connected with their unemployment. The emergency (non-ordinary) dues were established and paid for the purpose of supporting labor disputes. It was foreseeable that the dues would be used to support local strikes against General Motors. Because the operation of General Motors is comprised of a series of interrelated production units producing only one component of an automobile, it was also foreseeable that a strike against one plant could result in layoffs at plants not involved in the dispute, such as those

where the plaintiffs worked. The amount of the emergency dues when considered in the aggregate, in terms of the plaintiffs' contributions and in terms of the effect on the strikers, was significant and demonstrates a meaningful connection with the dispute that caused the plaintiffs' unemployment. Finally, the payment of the emergency dues immediately preceded the support of the dispute that caused the plaintiffs' unemployment. The time-lag between the collection and disbursement of the funds was minimal when considered in the light of the method employed. The funds were collected "by hand" at the local level, were forwarded to the union's strike insurance fund, and were distributed to the strikers only after the initial required waiting period had been satisfied.

5. State laws that conflict with federal laws are preempted by the Supremacy Clause of the United States Constitution unless Congress intended to tolerate the conflicting state law. The National Labor Relations Act provides that employees have the right to assist, including financially assist, labor organizations and to engage in other concerted activities for collective bargaining, mutual aid, or protection and that violation of the rights is an unfair labor practice. The Michigan Employment Security Act provides for disqualification of a worker from eligibility to receive unemployment benefits if the worker finances the labor dispute which causes his unemployment. Because the disqualification required by the Employment Security Act affects the exercise of the worker's right to assist the union as guaranteed by the NLRA, a conflict in fact exists. The defendant has the burden of showing that Congress intended to tolerate the conflict. There is no indication in the NLRA that Congress intended to tolerate the conflict, but the legislative history of the Social Security Act, enacted shortly after the NLRA, contains many indications of such intent: the states are to have almost complete control over unemployment compensation programs; during debate over the Social Security Act, there was considerable support for a provision to prohibit payment of unemployment benefits to strikers by the states; implementation of unemployment compensation programs was not required; rather, states that complied would be given financial and tax benefits; and draft bills to be used to guide states in instituting unemployment compensation programs specifically provided for disqualification for financing a labor dispute. It is significant that in the nearly 50 years following the enactment of the Social Security Act and the NLRA, during which many states have provided for disqualification of workers who finance labor disputes that cause their unemployment, Congress has never addressed the conflict, leading to the con-

clusion that it intended to tolerate the conflict. Thus, the Employment Security Act is not preempted by the NLRA, nor does it violate the Supremacy Clause of the United States Constitution.

6. The Employment Security Act on its face and as applied in this case does not violate the plaintiffs' First Amendment rights of freedom of association.

Chief Justice Williams, joined by Justice Levin, stated that considering payments from the strike insurance fund to be composed of the same percentage of regular dues and emergency dues as the larger fund will always result in some of the emergency dues remaining in the fund unless the fund is depleted, a result that is neither fair nor intended by the Legislature. Rather, by adopting a formula for determining whether the amount of financing of a labor dispute by payments from a strike fund is significant or *de minimis*, which views the last funds paid into the fund as being the first funds paid out, the voting and contribution of emergency dues would relate more proximately to distribution of an equivalent amount in strike benefits subject to triggering disqualification, the duration of emergency dues payments subject to disqualification would not be inflated by the overall size of the strike fund, and the strike fund would not be perpetually tainted. By contrast, adoption of a formula that would view the first funds paid into the fund as being the first paid out would result in a determination that strike funds would be paid out of the least proximately concerned moneys and, if the strike fund were large enough, that the emergency might pass without any emergency dues being paid out. Thus, the case should be remanded to the Board of Review to determine, using the last-in-first-out formula, whether any emergency funds beyond a *de minimis* amount actually financed strike benefits. If so, the plaintiffs would be disqualified from receiving benefits; if not, benefits should be paid.

Justice Boyle stated that she agreed with Chief Justice Williams that the last-in-first-out formula provides the fairest means of evaluating whether the plaintiffs were properly disqualified from receiving unemployment benefits for financing the labor dispute that caused their unemployment in light of the Court's adoption of "temporal proximity" as a factor to be considered in determining whether there was a meaningful connection between the plaintiffs' emergency dues payments and the dispute.

Affirmed.

OPINION BY RYAN, J.

1. UNEMPLOYMENT COMPENSATION — DISQUALIFICATION — VOLUNTARY
   UNEMPLOYMENT.

   *A person who is unemployed as a result of direct involvement in
   a labor dispute is ineligible to receive unemployment compensa-
   tion benefits because the unemployment is voluntary (MCL
   421.29; MSA 17.531).*

2. UNEMPLOYMENT COMPENSATION — DISQUALIFICATION — VOLUNTARY
   UNEMPLOYMENT — FINANCING LABOR DISPUTES.

   *A worker whose unemployment results from a labor dispute in an
   establishment in the United States functionally integrated with
   the worker's place of employment is not eligible to receive
   unemployment compensation benefits where the worker
   financed the dispute by paying funds to be used by the strikers
   and there is a meaningful connection between the financing
   and the unemployment (MCL 421.29[8][a][ii]; MSA
   17.531[8][a][ii]).*

3. UNEMPLOYMENT COMPENSATION — DISQUALIFICATION — FINANCING
   LABOR DISPUTES.

   *A meaningful connection exists between the financing by a
   worker of a labor dispute in an establishment functionally
   integrated with the worker's place of employment and his
   resulting unemployment where the worker significantly
   finances the dispute at a time proximately related to the
   dispute and it was foreseeable that the financing would cause
   his unemployment (MCL 421.29, 421.29[8][a][ii]; MSA 17.531,
   17.531[8][a][ii]).*

4. UNEMPLOYMENT COMPENSATION — DISQUALIFICATION — FINANCING
   LABOR DISPUTES — PURPOSE.

   *Determination of a worker's purpose in financing a labor dispute
   must be made in the light of the facts as they appeared at the
   time of the financing; statements by the worker or by officials
   of a union of which the worker is a member and which
   collected funds in support of strikers may be considered (MCL
   421.29, 421.29[8][a][ii]; MSA 17.531, 17.531[8][a][ii]).*

5. UNEMPLOYMENT COMPENSATION — DISQUALIFICATION — FINANCING
   LABOR DISPUTES — AMOUNT.

   *The significance of the amount of funds used to finance a labor
   dispute through a labor organization must be determined by
   reviewing the amount of the organization's entire program as
   well as individual contributions; where non-ordinary dues are
   used by a labor organization to raise funds to finance a dispute,
   the amount of the non-ordinary dues must be compared with
   the amount of regular dues and the effect of the non-ordinary*

dues on the resources of the organization allocated to support the dispute and the actual role played by the non-ordinary dues must be examined to determine whether the amount of the non-ordinary dues is significant or de minimis *(MCL 421.29, 421.29[8][a][ii]; MSA 17.531, 17.531[8][a][ii]).*

6. UNEMPLOYMENT COMPENSATION — DISQUALIFICATION — FINANCING LABOR DISPUTES.

*A direct transfer of funds from a worker to a striker need not be made for a meaningful connection to exist between financing a labor dispute and the worker's unemployment; payments made by a worker to a union for the benefit of strikers may provide a meaningful connection that would disqualify the worker from receiving unemployment compensation (MCL 421.29, 421.29[8][a][ii]; MSA 17.531, 17.531[8][a][ii]).*

7. UNEMPLOYMENT COMPENSATION — DISQUALIFICATION — FINANCING LABOR DISPUTES.

*Emergency dues paid by workers to their union for the purpose of supporting labor disputes amounted to financing the disputes and disqualified the workers from eligibility to receive unemployment compensation where it was foreseeable that the funds would be used to finance local strikes against other of their employer's production units and that because of the interrelated nature of each production unit to the total business of the employer the effect of a strike against one unit could be layoffs at units, such as the one that employed the workers, that were not involved in the dispute (MCL 421.29, 421.29[8][a][ii]; MSA 17.531, 17.531[8][a][ii]).*

8. UNEMPLOYMENT COMPENSATION — CONSTITUTIONAL LAW — FEDERAL PREEMPTION — DISQUALIFICATION.

*Disqualification of a worker under the Michigan Employment Security Act for eligibility to receive unemployment compensation where the worker finances a labor dispute that causes his unemployment is not preempted by the provision of the National Labor Relations Act guaranteeing workers the right to assist labor organizations, nor does it violate the Supremacy Clause of the United States Constitution; because Congress specifically approved disqualification of workers in the Social Security Act enacted shortly after the NLRA and has never addressed any conflict between such provisions in the laws of other states in almost 50 years since the NLRA was enacted, it can be inferred that Congress intended to tolerate any conflict (US Const, art VI, cl 2; 29 USC 157, 158; MCL 421.29[8][a][ii]; MSA 17.531[8][a][ii]).*

Opinion by Williams, C.J.

9. Unemployment Compensation — Disqualification — Financing Labor Disputes. ·

   *Disqualification of workers from receiving unemployment benefits on the ground that they financed the labor dispute that resulted in their unemployment by paying emergency dues into a union strike insurance fund subsequently used to pay strike benefits should not be determined by applying a formula to payments from the fund to determine whether the emergency dues were a significant or* de minimis *part of the strike benefits that considers payments to be composed of the same percentage of regular dues and emergency dues as the fund itself; rather, a formula which views the last funds paid into the fund as being the first funds paid out should be applied because the voting and contribution of emergency dues would relate more proximately to distribution of an equivalent amount in strike benefits subject to triggering disqualification, the duration of emergency dues payments subject to disqualification would not be inflated by the overall size of the strike fund, and the strike fund would not be perpetually tainted (MCL 421.29, 421.29[8][a][ii]; MSA 17.531, 17.531[8][a][ii]).*

*John A. Fillion* and *Jordan Rossen, Altshuler & Berzon* (by *Fred Altshuler, Stephen Berzon,* and *Trina Grillo),* and *Rothe, Mazey, Mazey & Hamburger* (by *William Mazey)* for the plaintiffs.

*Fildew, Hinks, Gilbride, Miller & Todd* (by *Jonathan N. Wayman),* and *Otis M. Smith,* General Counsel, and *J. R. Wheatley,* General Motors Corporation *(M. J. Basford* and *E. J. Dilworth, Jr.,* of counsel), for General Motors Corporation.

AFTER REMAND

Ryan, J. The issues in this case are whether the plaintiffs were properly disqualified under MCL 421.29(8)(a)(ii); MSA 17.531(8)(a)(ii) from receiving unemployment benefits for "financing" the labor dispute which caused their unemployment and

whether, if the plaintiffs were properly disqualified for "financing," MCL 421.29(8)(a)(ii); MSA 17.531(8)(a)(ii) is invalid as violative of the Supremacy Clause of US Const, art VI, cl 2 or of the First Amendment right to freedom of association. These issues arise in the context of the following facts.

On September 6, 1967, the United Automobile Workers contract with General Motors expired. Prior to its expiration, UAW members at GM had overwhelmingly authorized a strike. However, the UAW did not choose GM as its "target" company. Instead, the UAW called a national strike against the Ford Motor Company beginning on September 7, 1967. On October 2, 1967, the UAW called a national strike against the Caterpillar Tractor Company. However, work at GM continued without interruption during this entire time.

In early October, 1967, faced with stalemated bargaining at Ford and Caterpillar, the UAW called a special national UAW convention for October 8, 1967. The stated purpose of the special convention, according to the "UAW Proceedings,"[1] was threefold:

### "PURPOSE OF CONVENTION

"The Special Convention is being held to:

"1. Review the status of our 1967 collective bargaining effort.

"2. To consider revision of the dues program of the International Union, UAW, to provide adequate strike funds to meet the challenges of the 1967 and 1968 collective bargaining effort.

"3. To consider revisions of the Constitution of the International Union as it relates to the payment of dues, strike fund, membership eligibility, strike insur-

---

[1] The "UAW Proceedings" was the UAW's official published report of the special convention. The "UAW Proceedings" will hereafter be referred to simply as the Proceedings.

ance program and other matters related to emergencies facing the International Union, UAW."[2]

During the one-day special convention, the UAW amended Article 16 of its constitution to allow strike fund dues to be increased. Amended Article 16 read (in pertinent part) as follows:

"Article 16.
"Section 2(a) (New):
"Emergency Dues
"All dues are payable during the current month to the financial secretary of the local union.

"Commencing with the eighth (8th) day of October, 1967, until October 31, 1967, and for each month thereafter during the emergency as defined in the last paragraph of this subsection, union administrative dues shall be three dollars and seventy-five cents ($3.75) per month and Union Strike Insurance Fund dues shall be as follows:

"1. For those working in plants where the average straight time earnings * * * is three dollars ($3.00) or more, *twenty-one dollars and twenty-five cents ($21.25) per month.*

"2. For those working in plants where the average straight time earnings * * * is less than three dollars ($3.00), *eleven dollars and twenty-five cents ($11.25).*

*              *              *

"*This schedule of dues shall remain in effect during the current collective bargaining emergency as determined by the International Executive Board* and thereafter, if necessary, until the International Union Strike Insurance Fund has reached the sum of twenty-five million dollars ($25,000,000), at which time the dues structure established in 2(b) below, shall become effective."[3] (Emphasis added.)

---

[2] Plaintiffs' Appendix, p 487a.

[3] *Baker v General Motors Corp,* 409 Mich 639, 651-652, fn 4; 297 NW2d 387 (1980).

During the same convention, § 10(a) of Article 16 was amended to provide as follows:

Prior to the amendment of Article 16, each UAW member paid strike insurance dues of $1.25 per month and administrative dues of $3.75. Therefore, the amendment to Article 16 increased members' strike fund dues by 800% or 1,600%.[4]

The national strikes at Ford and Caterpillar ended before the first collection of the new special strike fund dues in October, 1967.[5] Nevertheless, the new emergency strike fund dues were collected from the UAW membership in October and November, 1967. Since there was no contract at GM until December 15, 1967, the dues were collected "by hand" by union stewards and not by GM through an automatic checkoff system.

In January and February, 1968, UAW members at GM foundry plants in Michigan, Ohio, and New York went on strike over disputed local issues. In accordance with UAW regulations, the striking GM foundry plant workers were paid strike benefits from the UAW's International Union Strike Insurance Fund (SIF). Due to the GM foundry plant strikes, work shortages developed at nonstriking GM plants. As a result of these work shortages, GM laid off the plaintiffs[6] in early 1968.

Following their layoff, the plaintiffs filed unem-

"Section 10(a) (New): During the emergency set out in Section 2(a), from each member's union administrative dues, each local union must remit a monthly per capita tax of one dollar and seventy-five cents ($1.75) and the local union shall retain two dollars ($2.00).

"In each month, each local union must remit the full amount of Union Strike Insurance Fund dues to the International Union, such dues to be placed in the International Union's Strike Insurance Fund. The member's monthly per capita tax and Strike Insurance Fund dues shall be forwarded to the International Secretary-Treasurer.

"One dollar ($1.00) of each reinstatement fee shall be forwarded to the International Secretary-Treasurer * * *."

[4] The amount of the increase depended upon the "average straight time" hourly wages at the UAW member's plant.

[5] The Ford strike ended October 22, 1967. The Caterpillar strike ended October 25, 1967. The majority of the Board of Review found that the increase was not needed for the Ford strike.

[6] Plaintiffs are all members of the UAW and employees at GM

ployment compensation claims with the Michigan Employment Security Commission. GM opposed these claims. GM asserted that the plaintiffs were disqualified from receiving unemployment benefits because they had "financed" the labor dispute which caused their unemployment by paying the emergency strike fund dues. GM cited the Michigan Employment Security Act § 29(8), which stated (in pertinent part):

"(8) An individual shall be disqualified for benefits for any week with respect to which his total or partial unemployment is due to a labor dispute in active progress, or to shutdown or start-up operations caused by such labor dispute, in the establishment in which he is or was last employed, or to a labor dispute (other than a lockout) in active progress, or to shutdown or start-up operations caused by such labor dispute, in any other establishment within the United States which is functionally integrated with such establishment and is operated by the same employing unit. No individual shall be disqualified under this subsection 29(8) if he is not directly involved in such dispute.

"(a) For the purposes of this subsection 29(8), no individual shall be deemed to be directly involved in a labor dispute unless it is established that:

* * *

"(ii) He is participating in or financing or directly interested in the labor dispute which causes his total or partial unemployment. The payment of regular union dues (in amounts and for purposes established prior to the inception of such labor dispute) shall not be construed as financing a labor dispute within the meaning of this subparagraph * * *." MCL 421.29(8)(a)(ii); MSA 17.531(8)(a)(ii).

Over GM's objections, the MESC approved plaintiffs' claims.

plants in Michigan. All plaintiffs paid the emergency strike fund dues authorized at the UAW Special Convention in October, 1967.

GM appealed the MESC decision to a hearing referee who reversed the MESC and disqualified the plaintiffs from unemployment benefits since they had "financed" the labor dispute which caused their unemployment by paying the emergency strike fund dues. The plaintiffs appealed the referee's decision to the Michigan Employment Security Appeal Board which affirmed the referee's decision that the plaintiffs were disqualified from benefits under the "financing" provision of MESA § 29(8) by their payment of emergency strike fund dues. The plaintiffs then appealed to three circuit courts. Two of the circuit courts reversed the appeal board's decision, while one affirmed the appeal board's decision. On appeal, the Court of Appeals held that the plaintiffs had "financed" the labor dispute which caused their unemployment by paying emergency strike fund dues and that they were, therefore, disqualified under MESA § 29(8)(a)(ii). *Baker v General Motors Corp,* 74 Mich App 237; 254 NW2d 45 (1977).

After granting leave to appeal, this Court decided three issues. *Baker v General Motors Corp,* 409 Mich 639; 297 NW2d 387 (1980). First, the Court determined that the plaintiffs' unemployment was "due to a labor dispute in active progress" and was not due to the GM/UAW seniority system. Second, the Court determined that the amended strike fund dues paid by the plaintiffs in October and November, 1967, were not "regular union dues," but rather were extraordinary emergency dues. Third, the Court determined that, while the dues were not ordinary, the payment of extraordinary dues did not automatically disqualify the plaintiffs from receiving unemployment compensation. For extraordinary or emergency dues to disqualify the plaintiffs, the "financing" through the payment of non-ordinary dues must

have a "meaningful connection" to the labor dispute which caused the plaintiffs' unemployment. To determine whether a "meaningful connection" existed in this case, the Court remanded the case to the Board of Review[7] for further proceedings to determine "whether plaintiffs' emergency dues payments were sufficiently connected with the local labor disputes which caused their unemployment to constitute 'financing' of those labor disputes." *Baker, supra,* p 668.

On remand, the Board of Review conducted hearings on June 2, 3, and 22, September 15, and October 13, 1981. At the completion of the October 13 hearing, the board closed the record to further evidence. However, during final arguments on December 8, 1981, the board reopened the record (over plaintiffs' objection) to allow GM to place in evidence the "Proceedings" of the 1967 UAW special convention which amended Article 16 to require the "emergency" dues and newspaper clippings about UAW officials' statements and actions in 1967 and 1968. The board, by a 3-2 plurality, issued a decision holding that a "meaningful connection" existed between the payment of the emergency dues and the labor dispute which caused the plaintiffs' unemployment. Therefore, the Board of Review denied plaintiffs unemployment benefits under MESA § 29(8)(a)(ii).

Since we had retained jurisdiction, the case returned to this Court. We affirm the judgment of the Board of Review and hold that a "meaningful connection" existed between the emergency dues and the local GM foundry strikes which caused the plaintiffs' unemployment. Additionally, we hold that MCL 421.29(8)(a)(ii); MSA 17.531(8)(a)(ii) does not violate the Supremacy Clause of the federal

---

[7] The Board of Review is the successor to the appeal board.

constitution since the financing of labor disputes is "conduct touch[ing] interests so deeply rooted in local feeling and responsibility that * * * we could not infer that Congress had deprived the states of the power to act," *San Diego Building Trades Council v Garmon,* 359 US 236, 244; 79 S Ct 773; 3 L Ed 2d 775 (1959), and since Congress has stated its intention to tolerate a "financing" disqualification to unemployment benefits. Finally, we hold that MCL 421.29(8)(a)(ii); MSA 17.531(8)(a)(ii) does not place unconstitutional burdens upon the plaintiffs' First Amendment rights of association.

I

In deciding the issues raised by the plaintiffs, it is necessary to understand the role of MESA § 29(8) in relation to the entire act and in relation to labor-management relations. Therefore, we begin with an overview of the MESA.

The MESA is Michigan's response to the Social Security Act of 1935, 49 Stat 620; 42 USC 301 *et seq.,* which provides for federal funding to states with state unemployment insurance programs. In defining eligibility for unemployment benefits, the MESA limited benefits to persons who are involuntarily unemployed. As the Legislature stated in the MESA's policy section:

"Sec. 2. The legislature acting in the exercise of the police power of the state declares that the public policy of the state is as follows: Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this state. *Involuntary unemployment* is a subject of general interest and concern which requires action by the legislature to prevent its spread and to lighten its burden which so often falls with crushing force upon the unemployed worker and his family, to the detriment of the welfare

of the people of this state. Social security requires protection against this hazard of our economic life." MCL 421.2; MSA 17.502. (Emphasis supplied.)

This Court recognized that the MESA is intended to benefit only those involuntarily unemployed. *I M Dach Underwear Co v Employment Security Comm*, 347 Mich 465, 472; 80 NW2d 193 (1956): "[c]learly the act was intended primarily for the benefit of those involuntarily unemployed." We have, therefore, interpreted the MESA in light of its stated purpose of not providing benefits to persons who are "voluntarily" unemployed.

Since the MESA is intended to provide benefits only to involuntarily unemployed persons, the purpose of § 29 is obvious. MESA § 29 lists the circumstances under which the Legislature holds that a person is not entitled to benefits under the MESA because he is *not* involuntarily unemployed. Subsection 8 of MESA § 29 specifically discusses labor disputes. Section 29(8), as applicable to this case, states that a worker is *not* involuntarily unemployed if his unemployment is due to a labor dispute in an establishment within the United States which is functionally integrated with his employment and *which was "financed" by the unemployed person.*

In our earlier decision, we determined that the plaintiffs' unemployment was due to a labor dispute in an establishment within the United States which was functionally integrated with that of the plaintiffs' place of employment. However, we did not resolve whether the plaintiffs were disqualified from unemployment benefits because their unemployment was due to their "financing" of a local labor dispute. We held that "financing" required a "meaningful connection" between the payment of non-ordinary strike fund dues and the local labor

dispute which caused the plaintiffs' unemployment. A "meaningful connection" between the financing and the labor dispute which caused the plaintiffs' unemployment was required since a person is "voluntarily" unemployed under MCL 421.29(8)(a)(ii); MSA 17.531(8)(a)(ii) only if he is "directly involved" in the labor dispute which causes his unemployment. We remanded the case to the Board of Review for a determination of whether such a meaningful connection existed showing that the plaintiffs were "directly involved" in the labor dispute which caused their unemployment.

With this brief background, we turn our attention to determining whether there is a "meaningful connection" between the plaintiffs' financing by payment of emergency strike fund dues and the labor dispute which caused their unemployment.

## II

The first assignment in determining whether the plaintiffs' financing has a "meaningful connection" to the labor dispute which caused their unemployment is to define what is meant by a "meaningful connection." Since this is an issue of first impression, we shall consider the parties' and the Board of Review members' recommended definitions of "meaningful connection."

## A

Not surprisingly, the plaintiffs and the defendants do not agree upon what elements properly should be included in the definition of "meaningful connection." Even where the parties agree on a given element of the definition of "meaningful connection," they disagree on whether the element is established in this case.

The plaintiffs ask the Court to define "meaningfully connected" as follows: there is a meaningful connection between the labor dispute which caused the claimant's unemployment and the claimant's financing if the claimant voluntarily, directly, and in significant amounts funded the labor dispute which caused the claimant's unemployment for the purpose of assisting the labor dispute, and with the intention that he personally benefit from the "success" of the labor dispute. This proposed definition has six elements. First, the financing must be "voluntary." The plaintiffs argue that the financing in this case was involuntary since they were required to make the payments or be subject to dismissal for not being UAW members in good standing. Second, the financing must involve a direct payment from the plaintiffs to those involved in the labor dispute. The plaintiffs argue that the financing in this case was not direct but rather was all accomplished through the UAW's SIF. Third, the financing must be in significant amounts. The plaintiffs argue that the financing in this case was only $20 or $40 per plaintiff which is *de minimis* and insignificant. Fourth, the financing must occur contemporaneously with the labor dispute. The plaintiffs argue that the financing in this case occurred in October and November, 1967, while the labor dispute occurred in January and February, 1968. Fifth, the financing must be for the purpose of assisting the particular labor dispute which caused the plaintiffs' unemployment. The plaintiffs argue that the financing in this case was not for the purpose of supporting the particular local labor disputes which caused their unemployment, but rather was for the purpose of supporting national strikes against Ford and Caterpillar. Finally, financing must include the intention that the plaintiffs benefit from the resolution of

the labor dispute issues in favor of the supported side. The plaintiffs argue that the local labor dispute issues did not affect the plaintiffs and that they had no intention of benefiting from the success of the labor disputes. Therefore, the financing in this case was remote rather than "meaningfully connected" to the labor dispute which caused the plaintiffs' unemployment. Since no aspect of the meaningful connection definition is satisfied by the plaintiffs' actions, the Board of Review's determination that the plaintiffs were disqualified from receiving unemployment benefits was erroneous.

The defendant, on the other hand would define "meaningful connection" as follows: there is a meaningful connection between the labor dispute which caused the claimant's unemployment and the claimant's financing if the claimant paid any non-ordinary dues for the purpose of supporting labor disputes which foreseeably included the labor dispute that caused the claimant's unemployment, and if the non-ordinary dues were in fact paid to support the labor dispute that caused the claimant's unemployment. This proposed definition had four elements. First, the claimant must have paid non-ordinary dues. The defendant notes that we held in *Baker, supra,* that the dues paid in this case were extraordinary and all plaintiffs admit paying such dues. Second, the purpose of the non-ordinary dues must have been to support labor disputes. The defendant claims that the dues in this case were intended to support labor disputes since they were paid to the UAW's SIF. Third, the supported labor disputes must foreseeably include the labor dispute that caused the claimant's unemployment. The defendant claims that local GM strikes were foreseeable. Finally, those involved in the labor dispute must receive benefits from the extraordinary dues payments. The defendant

claims that nearly half of the SIF strike benefits paid to the striking GM foundry workers were from the payment of the emergency dues authorized at the UAW special convention. Therefore, there is a "meaningful connection" between the plaintiffs' emergency dues payments and the strike that caused their unemployment; consequently, the Board of Review properly disqualified the plaintiffs under MESA § 29(8)(a)(ii).

### B

No Board of Review member adopted either of these tests *in toto.* Instead, each member adopted only certain elements from the suggested lists, and the board members were unable to agree upon a single "meaningful connection" definition. Each definition was an attempt to follow the guidance which we had given in *Baker, supra,* p 668:

"While the statute does not require that payments made by individuals whose disqualification is in issue be traced into the hands of workers involved in the labor dispute which caused the individuals' unemployment, the term 'financing' suggests a meaningful connection between the payment or class of payments said to constitute financing and the labor dispute allegedly financed."

We shall review each proposed definition individually.

### 1. *Test Applied by Members Viventi and Cohl*

For members Viventi and Cohl, a "meaningful connection" existed if the claimant's extraordinary dues payment involved significant amounts, was made at approximately the time of the labor dispute that caused the claimant's unemployment,

and was made for the purpose of supporting labor disputes which foreseeably included the labor dispute which caused the claimant's unemployment.

The first part of the Viventi/Cohl meaningful connection definition held that a meaningful connection existed only where the amount of financing through the payment of extraordinary dues was "substantial." If the amount of financing by payment of extraordinary dues was not "substantial," there was no meaningful connection between the financing and the labor dispute that caused the plaintiffs' unemployment. After noting that this Court did not require that "payments made by individuals whose disqualification is in issue be traced into the hands of workers involved in the labor dispute which caused the individuals' unemployment,"[8] members Viventi and Cohl found that the emergency dues paid in this case were in "substantial" amounts when one considered the effect of all of the payments. They supported this conclusion with the following findings:

1) Each plaintiff paid $10 or $20 per month in emergency dues.

2) The UAW raised $42 million in two months through the emergency dues. That amount essentially equaled the amount of the UAW's entire strike fund prior to the institution of emergency dues.

3) The $10 or $20 increase in UAW dues constituted an 800% or 1600% increase in each plaintiff's strike fund dues.

4) The foundry strikers received $247,000 from the UAW strike fund.

5) The 19,000 claimants alone contributed somewhere between $380,000 and $760,000 through emergency dues payments.

[8] *Baker, supra,* p 668.

6) At the time the January, 1968, payments began to the striking foundry workers, 53% of the fund was from regular dues payments while 47% of the fund was from emergency dues payments. When the February, 1968, payments were made, 51% of the fund was from regular dues payments while 49% of the fund was from emergency dues payments.

The second part of the Viventi/Cohl meaningful connection definition held that a meaningful connection existed only where the claimant's financing occurred at approximately the same time as the labor dispute that caused the claimant's unemployment. If there was no temporal proximity between the emergency dues payments and the payment of strike benefits to the strikers engaged in the local GM strike that caused the plaintiffs' unemployment, there was no meaningful connection between the plaintiffs' emergency dues payments and the labor dispute that caused the plaintiffs' unemployment. However, according to members Viventi and Cohl, the timing of the payment and the labor dispute in this case indicated that there was a meaningful connection between the two events. In support of their conclusion that the plaintiffs' emergency dues payments and the labor dispute that caused the plaintiffs' unemployment were temporally proximate, members Viventi and Cohl made the following findings:

1) The emergency dues were collected in October and November, 1967, at local UAW plants.

2) At the end of each month, the emergency dues were forwarded to the SIF of the UAW.

3) Those engaged in the labor dispute that caused the plaintiffs' unemployment received strike benefits from the UAW's SIF in January and February, 1968.

4) Therefore, the plaintiffs' emergency dues pay-

ments and the labor dispute which they assisted were separated by only about two months. The Supreme Court held that there was no rigid requirement that each plaintiff's emergency dues payment be traced directly to a GM foundry striker. Therefore, no extremely rigid time constraints should be placed upon consideration whether there is a temporal proximity between the plaintiffs' emergency dues payments and the labor dispute that caused the plaintiffs' unemployment. In this case, the two-month time lag does not destroy the temporal connection between the plaintiffs' emergency dues payments and the labor dispute that caused the plaintiffs' unemployment. The temporal proximity of the plaintiffs' emergency dues payments and the receipt of strike benefits from the SIF manifest a meaningful connection.

The final part of the Viventi/Cohl meaningful connection definition held that a meaningful connection existed only where the emergency dues were for the purpose of supporting labor disputes which foreseeably included the labor dispute that caused the claimant's unemployment. If the emergency dues were for a purpose other than supporting labor disputes or, while for the general purpose of supporting labor disputes, were not for the purpose of supporting labor disputes like the ones which caused the plaintiffs' unemployment, then there is no meaningful connection between the emergency dues payments and the labor dispute that caused the plaintiffs' unemployment. Members Viventi and Cohl looked to the statement of UAW officials who passed the emergency dues amendment and who explained the amendment to the UAW membership to determine the purpose for which the emergency dues were collected. In looking to these statements, members Viventi and

Cohl relied upon *Applegate v Palladium Publishing Co,* 95 Mich App 299; 290 NW2d 128 (1980), *lv den* 409 Mich 904 (1980). Having determined that the purpose of the UAW leadership binds the plaintiffs (UAW members), board members Viventi and Cohl conclude that the emergency dues were intended to fund local labor disputes at GM plants, including the foundry plants which caused the plaintiffs' unemployment. Members Viventi and Cohl support their conclusion that the purpose behind the emergency dues was to fund local strikes at GM plants with the following findings:

1) Article 16 of the UAW constitution allowed the UAW leadership to call an emergency meeting and to describe and delineate the emergency.

2) Ninety-eight percent of the delegates to the convention voted for the constitutional amendments allowing emergency dues.

3) The "Proceedings" and UAW letters to UAW members establish that the emergency dues were for purposes beyond the Ford and Caterpillar national strikes. There was no "earmarking" of the emergency dues for the Ford and Caterpillar national strikes. The purpose of the emergency dues included supporting local GM strikes.

4) Plaintiffs' emergency dues payments were voluntary since the UAW/GM contract ended September 6, 1967, and with it went the union security clause and the automatic check-off system.

Therefore, board members Viventi and Cohl determined that a meaningful connection existed between the plaintiffs' emergency dues payments and the labor disputes that caused the plaintiffs' unemployment. The meaningful connection existed because the amount of emergency dues paid was "substantial," the timing of the emergency dues payments and the labor dispute that caused the plaintiffs' unemployment was sufficiently proxi-

mate, and the purpose of the emergency dues payments included supporting local GM strikes. Consequently, since a meaningful connection existed between the payment of emergency dues and the labor dispute that caused the plaintiffs' unemployment, members Viventi and Cohl found that the plaintiffs were disqualified from receiving unemployment benefits by MESA § 29(8)(a)(ii).

## 2. *Test Applied by Chairperson Hall*

Chairperson Hall proposed what she considered a "more practical and expedient" test for determining whether there is a meaningful connection between the plaintiffs' emergency dues payments and the labor dispute that caused the plaintiffs' unemployment.[9] She stated that this "practical and expedient" test would be based upon the intent of the Legislature to disqualify only persons whose conduct "would tend to prolong a labor dispute."[10] As such, Chairperson Hall proposed a meaningful connection definition with only one element. A meaningful connection exists between the claimant's emergency dues payment and the labor dispute that caused the claimant's unemployment only where the claimant paying the emergency dues and the person engaged in the labor dispute shared common interests and objectives concerning the labor dispute that caused the claimant's unemployment. If there were shared interests and objectives, the plaintiffs were disqualified from receiving unemployment benefits under MESA § 29(8)(a)(ii). However, absent common interests and objectives, the plaintiffs were not disqualified.

Chairperson Hall concluded that the plaintiffs

---

[9] Plaintiffs' Appendix, p 742a.

[10] Plaintiffs' Appendix, p 377a.

shared common interests and objectives with the GM foundry strikers. She supports her conclusion with the following findings:

1) The plaintiffs and the foundry workers, through their union, sent a 60-day notice that the national agreement would not be renewed.

2) The plaintiffs and the GM foundry strikers were all subject to the emergency dues.

3) The same event triggered the labor dispute in which the plaintiffs and the striking GM foundry workers were involved; *i.e.*, the non-renewal of the national UAW/GM agreement.

Therefore, Chairperson Hall concluded that a meaningful connection existed between the payments of emergency dues and the labor dispute that caused the plaintiffs' unemployment. The meaningful connection existed because the plaintiffs and those engaged in the labor dispute that caused the plaintiffs' unemployment shared common interests and objectives.[11] Consequently, the plaintiffs were disqualified from receiving unemployment benefits by MESA § 29(8)(a)(ii).

### 3. *Test Applied by Member Gravelle*

Member Gravelle defined meaningful connection in a manner which he felt took into account "practical considerations and related issues implicated by [the] question" of a "meaningful connection," *Baker, supra,* p 668, and provided "a liberal construction * * * consonant with reason and good discretion." *Baker, supra,* p 664. Member Gravelle defined meaningful connection in terms of two facts. A meaningful connection exists, according to member Gravelle, where the claimant financed the labor dispute that caused his unemployment with

---

[11] Plaintiffs' Appendix, p 379a.

contemporaneous emergency dues payments. Therefore, a meaningful connection existed only where the plaintiffs both made payments to support the labor dispute that caused their unemployment and made those payments during the pendency of the labor dispute that caused their unemployment. As member Gravelle explained his meaningful connection definition,

"If the contributions in issue either are not contemporaneous with the labor dispute causing the unemployment or do not subsidize the labor dispute causing the unemployment, no disqualification can result."[12]

Member Gravelle claims the basis of his meaningful connection definition is the language of MESA § 29(8)(a)(ii) which uses the present tense "is" to explain the timing of the financing which will result in disqualification. Therefore, according to member Gravelle, MESA § 29(8)(a)(ii) does not allow disqualification for past financing.

Member Gravelle applies his meaningful connection definition to the facts of this case and concludes that the plaintiffs' emergency dues payments are not meaningfully connected to the labor dispute that caused their unemployment. Member Gravelle's conclusion is based upon the following findings:

1) The labor dispute which caused the plaintiffs' unemployment was either the local negotiations which preceded the three local strikes at GM foundry plants or the three local GM foundry strikes in January and February, 1968.

2) If the plaintiffs' unemployment was caused by the negotiations leading up to the local strikes, there is no meaningful connection between the plaintiffs' emergency dues payments and their un-

[12] Plaintiffs' Appendix, p 384a.

employment since these negotiations were funded entirely by regular dues. Therefore, there is no connection *in fact* between the plaintiffs' emergency dues payments and their unemployment.

3) If the plaintiffs' unemployment was caused by the local GM foundry strikes, there is no meaningful connection between the plaintiffs' emergency dues payments and their unemployment since, while the strikes were supported by SIF dollars including emergency dues, the plaintiffs' emergency dues payments were not contemporaneous with the strike that caused their unemployment. The emergency dues were paid in October and November, 1967, while the strike occurred in January and February, 1968.

Therefore, member Gravelle concluded that there was no meaningful connection between the plaintiffs' emergency dues payments and the labor dispute that caused their unemployment. Consequently, the plaintiffs were not disqualified from receiving unemployment benefits by MESA § 29(8)(a)(ii).

### 4. *Test Applied by Member Salomone*

Member Salomone joined member Gravelle's opinion and conclusion, but he added several parts to the meaningful connection definition proposed by member Gravelle. According to member Salomone, a meaningful connection exists between the claimant's emergency dues payment and the labor dispute that caused his unemployment only where the claimant voluntarily made direct, substantial payments during the pendency of the labor dispute that caused his unemployment and such payments were for the purpose of supporting, and actually did support, the labor dispute that caused the claimant's unemployment.

As applied to the facts of this case, member Salomone concluded that there was no meaningful connection between the plaintiffs' emergency dues payments and the labor dispute which caused their unemployment for the reasons stated in member Gravelle's opinion. In addition, member Salomone made the following findings:

1) The purpose of the emergency dues, whether one considers the union leadership's intent or the plaintiffs' individual intent, was only to support national strikes. There was no evidence on the record, according to member Salomone, that the purpose of the emergency dues was to support the local GM foundry strikes that caused the plaintiffs' unemployment.

2) The emergency dues payments were not voluntary. The plaintiffs were required to make the payments or risk losing their jobs for not being UAW members in good standing.

3) The amounts paid by each plaintiff were *de minimis* and insignificant. At most, each plaintiff paid $40 in emergency dues which may or may not have been actually used by the SIF to support the striking GM foundry workers.

4) In reality, union members' strike fund dues are an "insurance" fee and they intend that it inure only to their benefit.

Therefore, member Salomone concluded that there was no meaningful connection between the plaintiffs' emergency dues payments and the labor dispute that caused their unemployment. There was no meaningful connection because the plaintiffs' emergency dues payments were not voluntary, were in *de minimis* amounts, were not for the purpose of supporting local GM foundry strikes, were not contemporaneous with the labor dispute that caused their unemployment, and were not in fact used to support the local labor dispute

that caused the plaintiffs' unemployment (if the labor dispute was the negotiations leading up to the strikes). Consequently, member Salomone concluded that the plaintiffs were not disqualified from receiving unemployment benefits by MESA § 29(8)(a)(ii).

### 5. *Conclusion*

On their faces, the meaningful connection definitions proposed by the Board of Review members appear quite different. However, upon closer examination, it becomes evident that a majority of the board members considered three elements in determining whether plaintiffs' emergency dues payments were meaningfully connected to the labor dispute that caused their unemployment. The three elements included in most of the proposed meaningful connection definitions were amount, purpose, and timing.[13] In addition to these three elements, one member included "commonality" in her proposed meaningful connection definition and another member included "voluntariness" in his proposed meaningful connection definition.

We shall consider separately each element suggested for the meaningful connection definition.

### C

In evaluating the suggested meaningful connec-

| [13]Viventi & Cohl | Hall | Gravelle | Salomone | # |
|---|---|---|---|---|
| Amount | | | Amount | 3 |
| Purpose | | Purpose | Purpose | 4 |
| Timing | | Timing | Timing | 4 |
| | Commonality | | | 1 |
| | | | Voluntariness | 1 |

tion definitions and their constituent elements, we must remain mindful of the reasons that the Court in *Baker, supra,* required that the "financing" be meaningfully connected to the labor dispute that caused the plaintiffs' unemployment. MESA § 29(8)(a)(ii) is only one small part of a larger statute. In interpreting it in light of the whole statute, MESA § 29(8)(a)(ii) disqualifies persons who are "voluntarily" unemployed by financing the labor dispute that causes their unemployment. It does so because "financing" is one of the statutorily designated ways in which a person may evidence "direct involvement" in a labor dispute. MCL 421.29(8)(a); MSA 17.531(8)(a). Since "direct involvement" is prohibited activity, financing must be interpreted so that it helps the Court determine if the claimant was directly involved in the labor dispute that caused his unemployment. Consequently, "meaningfully connected" will be defined to include only those elements which manifest some direct involvement in the labor dispute that caused the claimant's unemployment. If a suggested element of a meaningful connection definition does not tend to show direct involvement compatible with the larger statute, it is not a proper element of the meaningful connection definition. The end result of a proper meaningful connection definition should be to delineate persons whose own activities have contributed to their unemployment so as to make them voluntarily unemployed and, therefore, ineligible for unemployment compensation benefits.

With this background, we turn our attention to determining the proper elements of the meaningful connection definition.

1

Three elements suggested by the plaintiffs and

by Board of Review members are not part of the meaningful connection definition since they do not tend to show the kind of direct involvement envisioned by MESA § 29(8)(a)(ii). These unacceptable elements of the meaningful connection definition are direct payments from claimants to persons engaged in a labor dispute, commonality, and voluntariness. We exclude these elements for the following reasons.

The plaintiffs would have us define meaningful connection so as to require that there be a direct transfer of funds from the claimant to the person engaged in a labor dispute. They correctly argue that such a requirement would show a meaningful connection and direct involvement justifying the claimant's disqualification from unemployment benefits. They are also correct in saying that, were the Court to adopt this element into the meaningful connection definition, the plaintiffs would not be disqualified since they paid the emergency dues to the UAW and the UAW's SIF rather than directly to the striking GM foundry workers. However, the plaintiffs are wrong in asserting that such a direct connection is required in every case in order for a meaningful connection to exist. For the following reasons, a meaningful connection can exist in this case without a direct transfer of funds from the plaintiffs to the strikers. First, to define meaningful connection as existing only where there is a direct transfer of funds from the claimant to the person engaged in a labor dispute would unnaturally limit and restrict the financing disqualification to situations not involving organizations (such as unions) which act on behalf of members to accomplish the group's goals. Such a definition would provide an enormous exception to the financing disqualification which would effectively eliminate the legislative disqualification for

financing. Second, a definition of meaningful connection which required a direct transfer of funds from the claimant to the person engaged in a labor dispute would conflict with the statutory language of MESA § 29(8)(a)(ii) which inherently recognizes that financing involving organizations is not exempt from the financing disqualification. This is evident from the statute's language which explicitly states that union dues which are "regular" and " 'in amounts and for purposes established prior to the inception of [the] labor dispute' " are not financing under the statute.[14] By eliminating certain payments made to labor disputers through unions, but not other payments which might be made to labor disputers through unions, the Legislature indicated that not all financing through organizations will prevent the claimant from being disqualified for "direct involvement" in a labor dispute through financing. Third, this Court said in *Baker, supra,* that a meaningful connection does not require that the money be traced directly from the claimant to the labor disputer. We recognized that an organization (such as a union) cannot be used to shield a claimant from the financing disqualification. Therefore, we hold that a payment from the claimant directly to the person engaged in a labor dispute is not part of the meaningful connection definition.

We also reject the plaintiffs' suggestion that there can be no meaningful connection unless the claimant and the person engaged in the labor dispute share common interests and objectives. While Chairperson Hall is correct in saying that this element would, if adopted into the meaningful connection definition, provide an "expedient" test for determining whether there is a meaningful connection between the claimant's financing and

[14] *Baker, supra,* p 668.

the labor dispute that caused the claimant's unemployment, she and the plaintiffs are incorrect in reading this requirement into the meaningful connection definition. Like directness (see above), "commonality" as an element of the meaningful connection definition is inconsistent with the statutory language of MESA § 29(8)(a)(ii). MESA § 29(8)(a)(ii) stated that a claimant is directly involved and therefore disqualified from receiving unemployment benefits if he is "participating in *or* financing *or* directly interested in the labor dispute which causes [the individual's] total or partial unemployment." MCL 421.29(8)(a)(ii); MSA 17.531(8)(a)(ii) (emphasis added). As is clear from the use of the disjunctive word "or," financing is a concept separate from "participating in" or "directly interested in." Financing does not, therefore, require a showing that the claimant was either participating in or directly interested in the labor dispute that caused his unemployment. "Directly interested" is defined in MESA § 29(8)(b) to encompass everything that the plaintiffs would have us include in the meaningful connection definition under the rubric of "commonality of interest and objective." MESA § 29(8)(b) states:

" 'Directly interested', as used in this subsection, shall be construed and applied so as not to disqualify individuals unemployed as a result of a labor dispute the resolution of which may not reasonably be expected to affect their wages, hours, or other conditions of employment, and to disqualify individuals whose wages, hours, or conditions of employment may reasonably be expected to be affected by the resolution of the labor dispute. A 'reasonable expectation' of an effect on an individual's wages, hours, or other conditions of employment shall be considered to exist, in the absence of substantial preponderating evidence to the contrary, in any of the following situations:

"(i) If it is established that there is in the particular

establishment or employing unit a practice or custom or contractual obligation to extend within a reasonable period to members of the individual's grade or class of workers in the establishment in which the individual is or was last employed changes in terms and conditions of employment which are substantially similar or related to some or all of the changes in terms and conditions of employment which are made for the workers among whom there exists the labor dispute which has caused the individual's total or partial unemployment.

"(ii) If it is established that 1 of the issues in or purposes of the labor dispute is to obtain a change in the terms and conditions of employment for members of the individual's grade or class of workers in the establishment in which the individual is or was last employed.

"(iii) If the labor dispute exists at a time when the collective bargaining agreement, which covers the individual's grade or class of workers in the establishment in which the individual is or was last employed and the workers in another establishment of the same employing unit who are actively participating in the labor dispute, has expired, has been opened by mutual consent or may by its terms be modified, supplemented, or replaced." MCL 421.29(8)(b); MSA 17.531(8)(b).

Since the statute treats commonality/directly interested as a concept separate and distinct from financing, it is not appropriately considered as part of the meaningful connection definition. Even without this statutory guidance, we would find that commonality is not part of the meaningful connection definition because MESA § 29(8)(a)(ii) is intended to disqualify those who are "voluntarily" unemployed as a result of financing the labor dispute which causes their unemployment. Whether one is financing a labor dispute and the degree to which he is doing so have no direct correlation with whether he will benefit from the "success" of the labor dispute. Therefore, we reject

the plaintiffs' suggestion that commonality is a necessary part of the meaningful connection definition.

Finally, we reject the plaintiffs' contention that "voluntariness" is a necessary element of any meaningful connection definition. The voluntariness of the claimant's funding is not relevant to the meaningfulness of the connection between the claimant's financing and the labor dispute which causes his unemployment. For example, a meaningful connection can exist where the claimant is forced to contribute directly to the labor dispute which causes his unemployment. Equally, there may be no meaningful connection where a contribution is voluntarily given. As such, voluntariness is not appropriately considered as a part of the meaningful connection definition since it says nothing about the meaningfulness or the connection between the payment and the claimant's unemployment.

However, we do not mean to say that voluntariness is irrelevant to disqualification under MESA § 29(8). Voluntariness is, of course, critical to a MESA § 29(8) discussion since MESA § 29(8) is intended to disqualify only those whose own actions cause their unemployment so that the unemployment is properly considered "voluntary." But, while voluntariness is relevant to the determination that "financing" or "participating" occurred, it is not relevant to a determination that the financing was meaningfully connected to the labor dispute which caused the claimant's unemployment. For that reason, it is excluded from the meaningful connection definition, but not from the earlier financing definition.

Lest we be required to hear this case a third time upon the plaintiffs' claim that the Board of Review failed to consider the voluntariness of their

contributions in finding that there was financing and that the financing was meaningfully connected to the labor dispute which caused the plaintiffs' unemployment, we will dispose of the plaintiffs' claim that their emergency dues payments were not voluntary. The plaintiffs argue that their emergency dues payments were not voluntary since they were required by the UAW in order for them to remain UAW members and required by GM/UAW contract since UAW membership was a criterion for employment. By making this argument, the plaintiffs are again trying to use an organization, the UAW, as a shield to protect themselves from disqualification for financing the labor dispute which caused their unemployment. As noted above, the statute does not recognize such a ploy. UAW membership is required for employment by GM because the UAW bargains for such a provision in its contract with GM. In so doing, the UAW represents its members and they must ratify any contract agreed upon by the UAW and GM. Therefore, any "coercion" resulting from the terms of the contract does not make the plaintiffs' action in accord with the contract "involuntary." As the Court of Appeals said in *Applegate v Palladium Publishing Co,* 95 Mich App 299, 305; 290 NW2d 128 (1980), and we adopt here:

"Action taken by employees under a contract negotiated for them by their authorized agent must be considered their voluntary acts. In effect, plaintiff agreed to [act] pursuant to the collective bargaining agreement."

Any other holding would make all actions taken by union members pursuant to a union contract involuntary and relieve the members of responsibility for their contract-based actions. We cannot agree with such a rule. The plaintiffs' emergency dues payments were not involuntary.

Therefore, payment of union dues pursuant to the union's constitution or rules, or pursuant to a collective bargaining agreement, is voluntary for purposes of determining whether a payment constitutes financing within the meaning of MCL 421.29(8)(a)(ii); MSA 17.531(8)(a)(ii). But voluntariness does not affect the determination of whether there is a "meaningful connection" between the financing and the labor dispute which proximately caused the claimant's unemployment.

2

Having eliminated those suggested elements which are not appropriate components of the meaningful connection definition, we are in a position to state affirmatively the meaningful connection definition. A meaningful connection exists where, for the purpose of supporting labor disputes foreseeably encompassing the labor dispute that caused the claimant's unemployment, the claimant engages in financing labor disputes in significant amounts and at times proximately related to the labor dispute which caused the claimant's unemployment.

Therefore, a meaningful connection between the financing and the labor dispute that caused the claimant's unemployment exists if three elements are present. First, the purpose of the financing must be, at least in part, to support labor disputes which foreseeably include the labor dispute that caused the claimant's unemployment. Second, the amount of financing must be significant, not *de minimis,* both in terms of the amount collected and in terms of the role that those funds played in the financing of the labor dispute that caused the claimant's unemployment. Third, the financing must occur at a time which is proximate to the

supported labor dispute that caused the claimant's unemployment. Only if all three elements are present is there a meaningful connection between the financing and the labor dispute that caused the claimant's unemployment.

We shall now discuss in greater detail each component of the meaningful connection definition.

### a. *Purpose*

The first component of the meaningful connection definition is delineated by the phrase "for the purpose of supporting labor disputes foreseeably encompassing the labor dispute which caused the claimant's unemployment." There are five aspects of the "purpose" requirement which merit further discussion.

First, it is assumed that by the time the Court considers whether a meaningful connection exists, it has already determined that the labor dispute which caused the claimant's unemployment was *in fact* financed by payments from the claimant. If it was not, there can be no meaningful connection between the claimant's payments and the labor dispute which caused his unemployment. This is true regardless of whether the claimant made the payments with the specific intent and for the specific purpose of assisting and supporting the labor dispute that caused his unemployment. Purpose, no matter how strong, will not substitute for actual financing.

Second, a meaningful connection between the financing and the labor dispute that caused the claimant's unemployment is demonstrated only if the labor dispute that caused the claimant's unemployment was foreseeably within the scope of labor disputes for which the claimant gave financing. If

it was not, there can be no meaningful connection. In other words, if the claimant gave financing for the purpose of supporting labor disputes different in kind or scope from the one that actually caused his unemployment, there is no meaningful connection between the financing and the labor dispute that caused the claimant's unemployment.

Third, in addition to the labor dispute financed being foreseeably within the scope of the purpose of the financing, the claimant's resulting unemployment must also be foreseeable. If the purpose of the financing was to support labor disputes which could not foreseeably have caused the claimant's unemployment, the purpose aspect of a meaningful connection definition has not been shown. This is so since MESA § 29(8)(a)(ii) is only intended to disqualify those persons who are "voluntarily" unemployed. A person who could not reasonably foresee the fact that his financing would cause his unemployment cannot be said to be "voluntarily" unemployed. Therefore, the purpose of the financing must potentially expose the claimant to unemployment caused by the labor disputes he financed.

Fourth, the purpose of the financing must be determined from the point in time that the financing occurred. It should not be determined by using hindsight or by reference to statements after the financing occurred. The purpose is determined according to the facts as they appeared at the time of the financing.

Fifth, the purpose of the financing in cases involving union dues may come either from the claimant's own statements or from the statements of union officials. It is not necessary that the individual union members consciously or affirmatively adopt the union's stated purposes. It is sufficient that the union collected the funds from

the claimant for the purpose of supporting labor disputes which foreseeably included the labor disputes that caused the claimant's unemployment. The union member may not assist the union's purpose by contributing while seeking to shelter himself from disqualification from unemployment benefits by not ratifying the union's purpose. As the Court of Appeals said in *Applegate, supra,* p 304, and we adopt here:

"by being a member of the union, the employees had ratified or joined in the decisions of the union and were bound by those decisions. 'Any other result would destroy the principles of collective bargaining and render union-management contracts meaningless.'" *Bergseth v Zinsmaster Baking Co,* 252 Minn 63, 70; 89 NW2d 172 (1958).

Therefore, the purpose of the financing may be found either in the claimant's own statements or in the statements of the organization which collects the funds and to which he is a member.

## b. *Amount*

A meaningful connection between the claimant's financing and the labor dispute that caused his unemployment must involve significant amounts of financing. *De minimis* amounts do not demonstrate a meaningful connection between the financing and the labor dispute that caused the claimant's unemployment. This is an important connection since, as the United States Supreme Court recognized in *New York Telephone Co v New York State Dep't of Labor,* 440 US 519, 526; 99 S Ct 1328; 59 L Ed 2d 553 (1979), it is a "fundamental truism" that the availability of strike benefits has a direct effect upon the willingness of persons to go on strike and, once on strike,

to remain on strike. Therefore, the amount of financing is an important consideration in determining whether there is a meaningful connection between the financing and the labor dispute that caused the claimant's unemployment.

In determining whether the amount of financing is significant or *de minimis,* the Court must consider four different figures. First, if the claimant is engaged in financing through an organization, the Court must review the amount of financing in terms of the entire program as well as in terms of the individual's contribution. Second, in cases of non-ordinary union dues, the Court must compare the claimant's regular contribution with his non-ordinary contribution to determine whether the amount of the "emergency" dues is significant or *de minimis.* Third, in cases involving non-ordinary union dues, the Court must consider the effect of the "emergency" dues upon the resources of the union allocated to supporting labor disputes. Finally, in cases involving regular and non-ordinary union dues, the Court must consider the role which the "emergency" dues played in supporting the labor dispute that caused the claimant's unemployment. Regarding the role that the "emergency" dues played in supporting the labor dispute which caused the claimant's unemployment, the plaintiffs contend that the Court must adopt one of two accounting methods: either they must say that the first funds into the account are the first funds out of the account (FIFO) or they must say that the funds last into the account were the first funds out of the account (LIFO). However, we find it unnecessary to adopt either the FIFO or the LIFO method. Where the plaintiffs' emergency dues payments go into a fund which also contains the non-emergency dues, the resulting commingling of the funds is attributable to the plaintiffs. Once com-

mingling occurs, both FIFO and LIFO are mythical in nature. Reality indicates that the funds are taken out of the account in proportion to their percentage in the funds. In other words, the percentage of the entire fund from each source is reflected in the disbursements from the fund. As applied to the UAW's SIF, which is composed of payments from both regular and emergency sources, payments from the fund should be considered to be composed of the same percentage of regular dues and emergency dues as the larger fund. We believe that such an approach is both fair and logical where the regular and emergency dues are commingled in a single fund.

### c. *Temporal Proximity*

A meaningful connection between the financing and the labor dispute that caused the claimant's unemployment requires that the payments be made at a time which is closely related to the labor dispute that caused the claimant's unemployment. The relationship between the timing of the financing and the timing of the labor dispute that caused the claimant's unemployment is important to any meaningful connection definition because the temporal connection may become so attenuated as to make the purpose of the payment or the amount of the payment meaningless.

However, requiring that the meaningful connection include temporal proximity does not require payments exactly contemporaneous with the supported labor dispute as the plaintiffs assert. Instead, temporal proximity requires that the two events, the financing and the labor dispute that causes the claimant's unemployment, be meaningfully connected in the sense that one event follow upon the other without a major break. The deter-

mination of whether there is temporal proximity or whether there is a break in the sequence that attenuated the connection depends upon the practical realities of the time needed to collect, transfer and disburse the non-ordinary funds. Since this is a factual determination which will depend upon the unique facts of each case, this Court will not establish bright line time limits within which there is temporal proximity and beyond which there is attenuation.

### d. *Conclusion*

A meaningful connection exists between the financing and the labor dispute that causes the claimant's unemployment where, for the purpose of assisting labor disputes which reasonably and foreseeably include the labor dispute that caused the claimant's unemployment, the claimant finances in significant amount and in temporal proximity the labor dispute that causes his unemployment. Where the Court finds these three elements present (purpose, amount, and timing), there is a meaningful connection between the financing and the labor dispute that causes the claimant's unemployment.

### D

### 1

Before we can apply the test to the facts of this case, we must first decide what facts were found by the Board- of Review. To do this, we must resolve the plaintiffs' challenges to the admittance of evidence at final arguments after the Board of Review reopened the record. The plaintiffs challenge the board's admittance of the evidence for three reasons: first, the Board of Review abused its

power in reopening the record to admit additional evidence, over plaintiffs' objections, at final arguments. Second, even if the Board of Review did not abuse its power in reopening the record, it exercised the power in such a way as to violate the plaintiffs' due process right to a fair hearing and deprived them of the opportunity to respond to the evidence. Third, the evidence was inadmissible for substantive reasons.

### a. *Reopening of Record to Admit UAW Documents and Newspaper Articles*

The plaintiffs contend that the opinion below is based upon incompetent evidence since the Board of Review abused its power by reopening the record at final arguments to admit UAW special convention "Proceedings," newspaper articles, and "Solidarity" newspaper articles. Admittedly, all five Board of Review members accepted and considered the additional evidence (in greater and lesser degrees) in reaching their conclusions.

However, the fact that the board reopened the record to admit the evidence does not make its admission erroneous and does not automatically bar its use. The presiding officer at an administrative hearing has the power to "[r]egulate the course of the hearings, set the time and place for continued hearings and fix the time for filing of briefs and other documents." MCL 24.280(d); MSA 3.560(180)(d). The law does not limit the chairperson's power to regulate the course of the hearings only prior to the closing of the record. Absent any stated legislative limit on the chairperson's power to regulate the course of the hearings following the closing of the record, we shall not create one. The Legislature committed this power to the discretion of the chairperson. Barring an abuse of

discretion, the chairperson may reopen the record at final arguments to admit additional evidence. The plaintiffs have not presented evidence that an abuse of discretion occurred in this case. Therefore, Chairperson Hall had the power to reopen the record and did not abuse her discretion in so doing.

### b. *Admission of Evidence Into Reopened Record as Violation of Right to Fair Hearing*

The plaintiffs contend that the Board of Review's admission of evidence into a reopened record violates their right to a fair hearing. Specifically, they allege that the Board of Review denied them the right to cross-examine and rebut the evidence admitted into the reopened record.

A party before the Board of Review has a right to cross-examine opposing witnesses and rebut the evidence against him. 1979 AC, R 421.1207(4)(c), (e). These rights are not reduced when the board reopens a record to admit additional evidence. However, both rights must be asserted to constitute a valid basis for objection on appeal. The record of the December 8, 1981, final arguments does not indicate that plaintiffs or their counsel asserted the right to cross-examine or rebut the evidence. Rather, they merely objected to the substantive admissibility of the evidence. After the board admitted the evidence, the hearing ended without further objection from the plaintiffs. The right to cross-examine witnesses and rebut evidence may be waived. In this case, it was waived by the plaintiffs' failure to assert it.

The plaintiffs having waived their right to cross-examine or rebut the evidence, the Court will not now find a due process violation (a denial of fair hearing), barring the existence of a miscarriage of

justice. No miscarriage of justice is presented in this case.

We find the plaintiffs' other assertion of due process violations to be without merit.

### c. *Admissibility of the Evidence*

*UAW "Proceedings"*

The plaintiffs raise five objections to the admission of the "Proceedings." First, the plaintiffs assert that the "Proceedings" are not the best evidence of what transpired at the special convention; the participants could provide the best evidence. Such an argument is based upon a misunderstanding of the best evidence rule; there is no hierarchy of evidence in Michigan and the best evidence rule only requires that the "original" document be produced. *Michigan Bankers Ass'n v Ocean Accident & Guarantee Corp, Ltd,* 274 Mich 470; 264 NW 868 (1936); MRE 1002.

Second, the plaintiffs assert that the "Proceedings" were not authenticated. However, the "Proceedings" were authenticated by the board's questioning of plaintiffs' attorney.[15]

Third, the plaintiffs object to the admission of the "Proceedings" on the ground that the defendant was not required to state the relevancy of the material. However, GM did state the relevancy of the "Proceedings": the evidence was offered to show the "intent motive" behind the special dues.[16]

---

[15] In response to inquiries, the plaintiffs' attorney admitted that "Proceedings" were probably transcribed from reporter's notes made at the time of the special convention, that "Proceedings" were published by the UAW, that "Proceedings" were the "official" version of what transpired at the convention, and that the UAW made the record with the intention that it be reliable and relied upon by its officials and any union members who read the "Proceedings." Plaintiffs' Appendix, pp 171a-172a.

[16] Plaintiffs' Appendix, p 170a; Tr. 12/8/81, p 10.

While the Board of Review never explicitly required GM to clarify their "intent motive" statement before admitting the evidence, the record sufficiently indicates that GM stated the relevancy of the "Proceedings" as showing the UAW's reason for requiring the emergency dues. Therefore, the board's admission of the "Proceedings" on this point is not error requiring reversal.

Plaintiffs' fourth claim is that the "Proceedings" are not relevant to their personal knowledge or purpose in paying the emergency dues at issue in this case since the "Proceedings" only show the UAW's intent or purpose. While the plaintiffs are correct in saying that the "Proceedings" do not contain their individual purpose statements, they are not correct in assuming that the UAW's intent is irrelevant to ascertaining whether there is a "meaningful connection" between the emergency dues and the strike which caused the plaintiffs' unemployment. See above.

Fifth, the plaintiffs contend that "Proceedings" are inadmissible hearsay. Michigan Rule of Evidence 801(d)(2) provides that admissions by a party-opponent are *not* hearsay. An admission is defined to include a statement by a party's "agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship," and offered against the party. MRE 801(d)(2)(D). A labor union is clearly the agent of its members concerning the purpose of proposed union dues and union collective bargaining strategy. Even if the "Proceedings" qualify as hearsay, Chairperson Hall developed, by her questioning of the plaintiffs' attorney, that the "Proceedings" fall within the business records exception to the hearsay rule. MRE 803(6). The "Proceedings" were the "official" record of what transpired at the special convention, they were com-

piled by the union according to a general practice, they were made soon after the special convention by persons with personal knowledge of what transpired at the special convention, and they were available to the union members as an accurate record of what transpired at the special convention. Under MRE 803(6), the "Proceedings" qualify as a business records exception to the hearsay rule.

### "Solidarity" Newspaper Articles

As with the "Proceedings," plaintiffs raise numerous objections to the Board of Review's admission of 22 newspaper clippings. Since the newspaper articles are sufficiently similar to be treated as one kind of evidence, and since the plaintiffs' objections are generalized, we shall not treat plaintiffs' objections to each newspaper clipping individually.

The plaintiffs' primary objection to the Board of Review's admittance of these newspaper articles is that they are and contain inadmissible hearsay. Specifically, the plaintiffs assert that the newspaper articles contain unsworn, out-of-court statements of reporters and their named and unnamed sources and that these statements were offered for the truth of the matter asserted. We agree with the plaintiffs that these newspaper articles are hearsay and that they do not fall within any recognized exception. However, while they should not have been admitted, the error is not so grievous that relief is required to correct the error. The information contained in the newspaper accounts merely confirms information contained in properly admitted evidence. Therefore, while erroneously admitted and not a proper independent basis for the Board of Review's decision, the evidence is merely supportive of other admissible evidence. It is noteworthy that the newspaper articles are cited

almost exclusively in footnotes supporting findings based upon the "Proceedings" or a UAW letter. We shall ignore them in this decision.

## 2

Having dealt with plaintiffs' evidentiary objections, we now apply the "meaningfully connected" definition to the facts of this case to determine whether the purpose of, amount of, and timing of the plaintiffs' emergency dues payments indicate a meaningful connection to the local GM foundry strikes which caused the plaintiffs' unemployment.

### a. *Purpose*

Under the meaningful connection definition, the purpose of the emergency dues payments must be to support labor disputes which foreseeably included the ones that caused the plaintiffs' unemployment. In this case, there can be no doubt that the emergency dues were assessed and paid for the purpose of supporting labor disputes. There is overwhelming support for this conclusion. First, the "Proceedings" stated the purpose of the special convention at which Article 16 of the UAW constitution was amended to require the payment of emergency dues payments to be as follows:

"1. Review the status of our 1967 collective bargaining effort.

"2. To consider revision of the dues program of the International Union, UAW, to provide adequate strike funds to meet the challenges of the 1967 and 1968 collective bargaining effort.

"3. To consider revisions of the Constitution of the International Union as it relates to the payment of dues, strike fund, membership eligibility, strike insur-

ance program and other matters related to emergencies facing the International Union, UAW."[17]

Second, the emergency dues payments were forwarded to the UAW International Union Strike Insurance Fund. As the name of the fund implies, the fund into which the emergency dues were paid was for the stated purpose of supporting labor disputes, specifically strikes. Third, as UAW executive Woodcock stated in his letter to GM UAW workers:

"These emergency extra dues are being raised to protect GM workers as well as support the Ford strikers. When our time comes at GM, we cannot go back to the bargaining table without an adequate strike fund behind us and promise of continued assistance from other UAW members."[18]

Therefore, it is clear that the emergency dues were established and paid for the purpose of supporting labor disputes.

However, as noted above, it is not sufficient that the emergency dues are for the purpose of supporting labor disputes. The payments must be for the purpose of supporting labor disputes, foreseeably including those that caused the plaintiffs' unemployment. On this point, the plaintiffs contend that their emergency strike fund dues were intended only for the support of the national strikes against Ford and Caterpillar. Alternatively, they argue that even if the emergency dues were intended to support labor disputes beyond the Ford and Caterpillar strikes, the purpose of the emergency dues was limited to supporting national strikes and excluded supporting local strikes similar to the ones that caused the plaintiffs' unemployment.

[17] Plaintiffs' Appendix, p 487a.
[18] 1967 Ex. 90.

However, the record does not support the plaintiffs' contentions.

It is clear that the impetus for the October 8, 1967, special convention was the stalemated bargaining and national strikes against Ford and Caterpillar. However, the purpose of the emergency strike dues approved at the October 8, 1967, conference was not limited to the national strikes at Ford and Caterpillar. The background statement of the "Proceedings" mentions other possible strikes beyond the national strikes at Ford and Caterpillar.

"To support the Ford and Caterpillar workers in their strike and to assure strike benefits to members who may be involved in other strikes in the course of the critical weeks and months ahead, a temporary emergency dues increase is needed, the total increase going into the International Strike Fund to be used exclusively to support workers and their families when they are forced to strike to achieve their just demands."

Later in the "Proceedings," UAW official Mazey said:

"In the event we have a strike at General Motors—and my educated guess is that unless General Motors Corporation begins to bargain intelligently and unless the GM Corporation begins to improve the grievance procedure and representation system in the GM contract, we are going to have a strike in that corporation —I am sure that nobody would want Vice President Leonard Woodcock and the bargaining committee to go to the bargaining table at General Motors with our strike fund depleted."

Additionally, it is clear that the purpose of the emergency dues was not limited to supporting the Ford and Caterpillar national strikes since those strikes ended before the first emergency dues were

forwarded to the UAW's SIF.[19] Finally, the emergency dues amendment to UAW Constitution, Article 16, does not place any limitation upon the future use of the funds raised by the emergency dues. Therefore, the evidence shows that the purpose of the emergency dues was not merely to support the national strikes against Ford and Caterpillar.

The record also does not support the plaintiffs' contention that the purpose of the emergency dues excluded assisting persons engaged in local labor disputes with GM. Rather, it is clear that local GM UAW members were potential beneficiaries of the emergency strike dues. As Leonard Woodcock, then UAW Vice President and Director of the General Motors Department, said in an October 13, 1967, letter issued to explain the increased strike dues and addressed "To All UAW Members in General Motors Plants and Warehouses, USA":

"Every penny of this increase will go into the strike fund to help pay strike assistance benefits to Ford and Caterpillar Tractor strikers and other UAW members currently on strike. It is also needed to replenish the fund so that our bargaining teams at General Motors and Chrysler—and other plants—can bargain with the assurance that strike assistance benefits will be available should those workers have to hit the bricks later on.

* * *

"These emergency extra dues are being raised to protect GM workers as well as support the Ford strikers. When our time comes at GM, we cannot go back to the bargaining table without an adequate strike fund behind us and promise of continued assistance from other UAW members."[20]

---

[19] The national Ford strike was settled October 22, 1967, and the national Caterpillar strike was settled October 25, 1967.

[20] 1967 Ex. 90.

The letter goes on to make it clear that the emergency dues will be available to support local strikes when it justifies the emergency dues by citing 1964 GM local strikes:

"In 1964, you will recall, we had a 10-day strike at GM on national issues, followed by many local strikes, some lasting as long as six weeks. This resulted in a strike fund expenditure of $37,383,698.08."[21]

Additionally, the record adequately demonstrates the crucial role of local strikes in contract negotiation. Local strikes, funded by the UAW's SIF, occurred following a national contract agreement with GM in *every* contract year starting in 1958.[22] These local strikes, most notably those in 1964, were very costly to the UAW's SIF.[23] Therefore, at the time that the emergency dues were paid, both national and local strikes appeared possible and even probable. Consequently, the evidence shows that supporting local GM strikes was within the purpose of the emergency dues payments and that it was foreseeable that the emergency dues would *in fact* be used to support local GM strikes.

The final aspect of the purpose analysis focuses on whether it was foreseeable at the time of the financing that supporting the labor disputes would cause the claimant's unemployment. In this case, there is and can be no dispute on this issue. Since it was foreseeable that local GM strikes would occur and be financed by the emergency dues, and since automotive industry production is based upon a series of interrelated production units which produce only one component of the automobile, it is obvious that a local labor dispute

---

[21] 1967 Ex. 90.

[22] Tr. 6/22/81, pp 18, 24.

[23] Tr. 6/22/81, pp 19, 28.

which idles one plant might cause layoffs at other plants which rely upon the component produced at the idled plant. This "chain reaction" can move both "up" and "down" the line. Therefore, layoffs at plants not presently engaged in a local labor dispute were foreseeable due to local disputes.

In conclusion, the evidence adduced in this case supports the conclusion that the purpose of the emergency dues included supporting labor disputes including those that actually caused the plaintiffs' unemployment. Therefore, the first portion of the meaningful connection definition is met.

### b. *Amount*

The second element of the meaningful connection definition considers whether the amount of financing is significant so as to demonstrate a meaningful connection to the labor dispute that caused the claimant's unemployment. As applied to this case, we must, under this portion of the meaningful connection definition, consider three aspects of the amount contributed through emergency dues. Each aspect considered points to the conclusion that the amount of financing involved in the emergency dues payments was significant and is meaningfully connected to the labor dispute that caused the plaintiffs' unemployment.

First, when we consider the amount of financing involved with the entire emergency dues program, we cannot help but be impressed with the significant role that the emergency dues played in the UAW's ability to financially support labor disputes. The significance in turn is due to the amount of financing involved in the emergency dues program. This is manifested by the following numbers which demonstrate both the amount and importance of the emergency dues for the UAW's

SIF. On October 31, 1967, the UAW's SIF contained $41,685,651.[24] This amount was essentially due to regular dues contributions plus interest earned on that money. In November, 1967, the UAW's SIF received new payments totaling $14,195,411.[25] Of this amount, only $2,070,504 came from regular union dues while $12,124,907 came from the emergency dues.[26] The disbursements from the SIF for November, 1967, totaled, $12,544,860.[27] Therefore, the ratio of each dollar disbursed in November, 1967, that came from the SIF was: 78 cents from the payment of regular dues and 22 cents from the payment of emergency dues.[28] In December, 1967, the SIF took in $13,441,418 of which $2,070,504 was from regular union dues and $11,207,914 was from the payment of emergency dues.[29] Of the $3,686,807 disbursed from the SIF in December, 1967, the ratio of each dollar disbursed was 63 cents from regular dues and 37 cents from emergency dues.[30] At the beginning of 1968, the SIF had grown to $53,090,814 and added $14,893,039 in January receipts.[31] Of the new funds, $12,772,535 came from emergency dues payments.[32] Of the $2,809,765 disbursed in January, 1968, the ratio of each dollar was 53 cents from regular dues and 47 cents from emergency dues.[33]

---

[24] Plaintiffs' Appendix, p 263a.

[25] Plaintiffs' Appendix, p 264a.

[26] The regular dues figure represents the average monthly income from regular dues during the first ten months of 1967.

[27] Plaintiffs' Appendix, p 264a.

[28] Total in fund during month: 55,881,062 = 41,685,651 + 14,195,411. Regular dues in fund: 43,756,155 = 41,685,651 + 2,070,504. Emergency dues in fund: 12,124,907. 43,756,155 divided by 55,881,062 = .78, 12,124,907 divided by 55,881,062 = .22.

[29] Plaintiffs' Appendix, p 264a.

[30] Plaintiffs' Appendix, pp 358a-359a. Computation as per fn 28.

[31] Plaintiffs' Appendix, p 265a.

[32] Plaintiffs' Appendix, p 265a. See fn 26.

[33] Plaintiffs' Appendix, pp 358a-359a. Computation as per fn 28.

In February, 1968, the SIF had income of $6,180,-213 of which $4,109,709 was attributable to the emergency dues.[34] Therefore, the ratio of each dollar disbursed in February ($5,044,792) was 51 cents from the regular dues and 49 cents from emergency dues.[35] Therefore, the amount of the payments was significant and consequently manifests a meaningful connection to the labor dispute that caused the plaintiffs' unemployment.

Second, when we consider the amount of financing in terms of the plaintiffs' payments, we again find that the amounts were significant and demonstrate a meaningful connection to the labor dispute that caused the plaintiffs' unemployment. Prior to the commencement of emergency dues, each plaintiff (like all UAW members) paid $1.25 per month to the UAW's SIF. After the commencement of emergency dues, each plaintiff paid either $11.25 or $21.25 per month to the UAW's SIF.[36] The emergency dues therefore increased the plaintiffs' support of the UAW's SIF by either 800% or 1600%. By any standard, the amount of increase is significant and demonstrates a meaningful connection with the labor dispute that caused their unemployment. Even beyond the amount of increase, the dollar amount contributed by the plaintiffs is also significant and demonstrates a meaningful connection with the labor dispute which caused their unemployment. Each plaintiff paid either $10 or $20 per month for emergency dues. These payments were continued for two months. Therefore, during the two months that the emergency dues were in effect, the 19,000 plaintiffs contributed between $380,000 and $760,000 in emergency dues

[34] Plaintiffs' Appendix, p 266a. See fn 26.

[35] Plaintiffs' Appendix, pp 358a-359a. Computation as per fn 28.

[36] UAW S Ct Appendix, p 37a and UAW "Proceedings," Plaintiffs' Appendix, p 500a. See fn 6.

to the UAW's SIF. These amounts are significant, not *de minimis,* and represent a meaningful connection with the labor dispute that caused the plaintiffs' unemployment.

Third, when we consider the amount of financing in terms of the role emergency dues played in the strike benefit payments to persons involved in the labor dispute that caused the plaintiffs' unemployment, we again find that the amounts are significant and demonstrate a meaningful connection with the labor dispute which caused the plaintiffs' unemployment. At the time that striking GM foundry workers received SIF benefits in January, 1968, the SIF was composed of 53% regular dues and 47% emergency dues.[37] By February, 1968, the SIF was composed of 51% regular dues and 49% emergency dues.[38] Consequently, the source of the benefits paid to the striking GM foundry workers was nearly evenly divided between regular dues and emergency dues. Therefore, the amount of the strike payments to the strikers involved in the labor dispute that caused the plaintiffs' unemployment from emergency dues is significant and demonstrates a meaningful connection with the labor dispute that caused the plaintiffs' unemployment.

All three aspects of the amount portion of the meaningful connection definition point toward a meaningful connection between the plaintiffs' payment of emergency dues and the labor dispute that caused their unemployment.

### c. *Timing*

The final element of the meaningful connection definition considers whether the financing is temporally proximate to the labor dispute that caused

[37] See fn 33.
[38] See fn 35.

the claimant's unemployment. As applied to this case, we find that this portion of the meaningful connection definition is satisfied since the payment of emergency dues immediately precedes the support of the labor dispute that caused the plaintiffs' unemployment.

The UAW amended its constitution to provide for the collection of the emergency strike fund dues on October 8, 1967. The dues were collected from the UAW members in October and November, 1967. The SIF received emergency strike fund payments in November and December, 1967. The SIF disbursed strike fund benefits to the striking GM employees in January and February, 1968. The time lag between the collection and disbursement of the strike fund benefits is minimal when it is considered that the funds were collected "by hand" at the local level, were forwarded to the SIF, and were distributed to striking GM employees only after they had satisfied an initial waiting period requirement. Therefore, the temporal proximity of the plaintiffs' emergency dues payments and the use of those emergency dues to support the labor dispute that caused their unemployment demonstrate that a meaningful connection exists.

### d. *Conclusion*

The three components of the meaningful connection definition are all satisfied in this case. The purpose of, amount of, and timing of the plaintiffs' emergency dues payments all indicate that there is a meaningful connection between their payments and the labor dispute that caused their unemployment. Therefore, the Board of Review properly concluded that the plaintiffs were disqualified from receiving unemployment benefits by MESA § 29(8)(a)(ii). The plaintiffs are not eligible

for unemployment benefits because they caused their unemployment by financing, in a meaningfully connected way, the labor dispute that caused the plaintiffs' unemployment.

## III

The plaintiffs claim that the MESA § 29(8)(a)(ii) financing disqualification violates the federal constitution's Supremacy Clause (US Const, art VI, cl 2) since the financing disqualification inhibits the exercise of rights guaranteed in § 7 and § 8 of the National Labor Relations Act. Specifically, the plaintiffs contend that the NLRA, a federal statute, guarantees the plaintiffs, as employees, the right to "assist labor organizations" and to "engage in other concerted activities for the purpose of collective bargaining." NLRA § 7; 29 USC 157. However, according to the plaintiffs, MESA § 29(8)(a)(ii) penalizes the plaintiffs for exercising these federally guaranteed rights by making financial assistance to one's labor union a basis of disqualification from entitlement to unemployment benefits. Therefore, under the Supremacy Clause, the plaintiffs contend, the federal statute (NLRA) pre-empts the state statute (MESA § 29[8][a][ii]) which conflicts with the congressional intent to guarantee certain rights to employees as expressed in § 7 and § 8 of the NLRA.

## A

The Supremacy Clause of the federal constitution states:

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all

Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." US Const, art VI, cl 2.

The pre-emption doctrine of the Supremacy Clause is well established and may be easily stated. The Supremacy Clause pre-empts state laws which conflict with federal laws except where congressional intent to tolerate the conflicting state law exists. The general test adopted by the United States Supreme Court to determine when the Supremacy Clause has been violated may also be easily stated. The two-part test involves, first, determining whether there is *in fact* a conflict between the federal law and the state law and, second, determining whether Congress intended to tolerate such a conflict between the federal law and the challenged state law.

However, easy articulation of the pre-emption rule and test does not translate always into easy application of the state rule and test to a given fact situation. In reality, the task of determining whether the Supremacy Clause has been violated is often difficult.

The difficulty involved in applying the pre-emption doctrine to the facts of a given case is particularly apparent when state laws "conflict" with federal labor relations laws. As the United States Supreme Court said in *Garner v Teamsters Union,* 346 US 485, 488; 74 S Ct 161; 98 L Ed 228 (1953), regarding federal labor relations law pre-emption:

"The national * * * Act * * * leaves much to the states, though Congress has refrained from telling us how much. We must spell out from conflicting indica-

tions of congressional will the area in which state action is still permissible."[39]

More recently, the United States Supreme Court again spoke of the subtle and sometimes arduous task of determining whether the federal labor relations law pre-empts a challenged state law:

"The doctrine of labor law pre-emption concerns the extent to which Congress has placed implicit limits on 'the permissible scope of state regulation of activity touching upon labor-management relations.'" *New York Telephone Co v New York State Dep't of Labor,* 440 US 519, 527; 99 S Ct 1328; 59 L Ed 2d 553 (1979), citing *Sears, Roebuck & Co v San Diego County Dist Council of Carpenters,* 436 US 180, 187; 98 S Ct 1745; 56 L Ed 2d 209 (1978).

B

Each party, however, seeks to rescue this Court from the necessity of treading a path of implicit limits and unstated boundaries by directing our attention to one United States Supreme Court case which provides *the* answer to whether the financing disqualification contained in MESA § 29(8)(a)(ii) conflicts with § 7 and § 8 of the NLRA in violation of the Supremacy Clause. The plaintiffs, for their part, cite *Nash v Florida Industrial Comm,* 389 US 235; 88 S Ct 362; 19 L Ed 2d 438 (1967). The defendant, on the other hand, cites *New York Telephone Co v New York State Dep't of Labor, supra.* Upon close examination, however, we are

[39] The *Garner* language speaks of the Labor Management Relations Act and not of the NLRA. However, the United States Supreme Court has cited the *Garner* language as edited and quoted here in NLRA cases. See *Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v Wisconsin Employment Relations Comm,* 427 US 132, 136; 96 S Ct 2548; 49 L Ed 2d 396 (1976).

convinced that neither case controls the issue raised in this case.

In *Nash*, the claimant was disqualified from receiving unemployment compensation benefits because the Florida Industrial Commission found that she was engaged in a labor dispute with her employer. According to the commission, a labor dispute existed because a state law said that the filing of a charge with the National Labor Relations Board by an employee against her employer constituted a labor dispute. Further, the state law disqualified from unemployment benefits all persons whose "total or partial unemployment is due to a labor dispute in active progress which exists at the * * * premises at which he is or was last employed."[40] The claimant appealed this decision to the United States Supreme Court where she argued that the commission's ruling violated the Supremacy Clause of the federal constitution because the ruling "frustrated" enforcement of the NLRA.

The United States Supreme Court agreed with the claimant and held that the state statute conflicted with the NLRA and that the federal law pre-empted the state law since enforcement of the state law would "thwart" the congressional intent and would "impede" resort to the federal act.[41] In reaching this result, the United States Supreme Court used a two-step analysis. First, it identified the conflict between the federal right asserted by the claimant and the state law relied upon by the commission. The federal right was found in § 8 (a)(4) of the NLRA which makes it an unfair labor practice for employers to discriminate against em-

---

[40] Florida Unemployment Compensation Law, § 443.06, renumbered § 443.101.

[41] *Nash, supra,* p 239.

ployees who filed unfair labor practice charges.[42]
The state law, on the other hand, made the exercise of that federal right the basis for disqualification from unemployment compensation benefits. Therefore, the state law had a direct tendency to frustrate the federal right. Second, having identified a conflict in fact between federal law and the challenged state law, the United States Supreme Court stated that there was no congressional intent to tolerate such a conflict. The intent of Congress was to "leave people free to make charges of unfair labor practices to the Board." The state law had a "direct tendency to frustrate the purposes of Congress." *Nash, supra,* p 239. Therefore, the federal law pre-empted and invalidated the state law.

Relying upon *Nash,* the plaintiffs assert that *Nash* is controlling in this case. To support their assertion they apply the United States Supreme Court's *Nash* analysis to the facts of this case. First, they identify the federal rights allegedly involved in this case: NLRA §§ 7 and 8; 29 USC 157, 158. NLRA § 7 provides, in pertinent part, as follows:

"Employees shall have the right to * * * join, or assist labor organizations * * * and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection * * *."

NLRA § 8 makes the violations of the NLRA § 7 right an unfair labor practice. The MESA, according to the plaintiffs, disqualifies them from receiving unemployment benefits merely because they

---

[42] The NLRA "employer" provisions are equally applicable to the state. As the United States Supreme Court stated in *Nash,* p 239:

"We have no doubt that coercive actions which the Act forbids employers and unions to take against persons making charges are likewise prohibited from being taken by the States."

have asserted their federal right to "assist" their union by paying union dues. Having identified the conflict, the plaintiffs cite *Nash,* p 239:

"[A state] should not be permitted to defeat or handicap a valid national objective by threatening to withdraw state benefits from persons simply because they cooperate with the Government's constitutional plan * * *."

The plaintiffs continue their argument by stating that:

"*Nash* governs this case, precisely because, through application of § 29(8)(a)(ii) of MESA, the state has impaired claimants' rights which, under NLRA, are expressly protected against * * * coercion * * *."[43]

Second, the plaintiffs argue that, as in *Nash,* Congress intended to pre-empt state laws in conflict with the guarantee that employees could "assist" their unions. Therefore,

"*Nash* * * * is clearly dispositive here: just as Florida was forbidden in *Nash* to interfere with the protected right to complain to the NLRB by denying unemployment benefits to those who do so, Michigan may not deny unemployment insurance benefits when the effect of that denial is to impair the right, also protected under the NLRA, to pay dues to a union * * *."[44]

However, we disagree with the plaintiffs' assertion that *Nash* is controlling in this case. We do so because *Nash* involved the right of employees to make claims to the NLRB. Regarding that specific right, the United States Supreme Court held that there was no congressional intent to tolerate a

---

[43] Plaintiffs-Appellants' Supplemental Brief (1979), p 17.

[44] Plaintiffs-Appellants' Supplemental Reply Brief (1979), p 6.

conflict between a state law and the exercise of the federal right to report to the NLRB. However, the United States Supreme Court's holding is not so broad as to support the plaintiffs' assertion that it covers this case. In *Nash,* the United States Supreme Court did *not* hold that Congress did not intend to tolerate any conflict between a state law and any § 7 or § 8 NLRA right. Instead, it stated a specific finding concerning the right of employees to file complaints with the NLRB. Therefore, contrary to the plaintiffs' assertions, while *Nash* provides guidance to this Court, *Nash* is not controlling since it says nothing concerning a state unemployment compensation disqualification of persons who financed the labor dispute which caused their unemployment, and it says nothing about congressional intent concerning financial disqualifications from unemployment benefits for paying extraordinary dues.

Citing *New York Telephone, supra,* the defendant claims that there is controlling United States Supreme Court authority supporting the defendant's position. In *New York Telephone,* the claimants were striking telephone company workers who, according to New York state law, were entitled to unemployment benefits after a waiting period. The telephone company asserted that the state law providing benefits to striking workers was a violation of the Supremacy Clause since it was required to bear the major share of the financial burden of paying striking workers unemployment benefits. This, the company asserted, violated the NLRA which was intended to allow competing parties to decide a labor dispute according to "the free play of economic forces in the collective bargaining process." *New York Telephone, supra,* p 526. However, the State Department of Labor

awarded unemployment benefits to the striking workers.

The telephone company challenged the award of benefits in the federal district court on the basis that the state law was pre-empted by the federal labor law. The district court held that the availability of unemployment benefits was a substantial factor affecting whether workers were willing to go out on strike and, once there, were willing to stay on strike. This obviously affected the balance of economic forces in the collective bargaining process and conflicted with the federal policy of free collective bargaining. Therefore, the district court declared that the federal labor relations law pre-empted the state unemployment law. The claimants then appealed to the United States Court of Appeals which reversed the district court's decision. The Court of Appeals held that the conflict identified by the district court did in fact exist, but that the conflict was one which the Congress intended to tolerate as indicated in the legislative histories of the NLRA and Title IX of the Social Security Act. See 26 USC 3301 *et seq.*, 42 USC 501 *et seq.*, and 42 USC 1101 *et seq.* The telephone company appealed the case to the United States Supreme Court.

By a plurality decision, the United States Supreme Court affirmed the Court of Appeals decision. Justice Stevens, joined by Justices White and Rehnquist, began his opinion by distinguishing this case from some earlier United States Supreme Court labor relation pre-emption cases. First, this case did not involve conduct arguably protected by § 7 or § 8 of the NLRA. Second, it did not involve a state attempt to regulate labor relations; instead, it involved a state program for the distribution of state benefits. Therefore, since the challenged law was a state law of general applicability which

implemented a broad state policy in an area of important local interest, it was presumed that Congress did not intend to deprive the state of the authority to so act. Here, rather than a compelling congressional direction precluding state action in conflict with the federal labor relations laws, Congress omitted any direction indicating that it was depriving the state of the authority to make unemployment benefit payments to striking workers. In fact, there is considerable indication that Congress was aware of the conflict and chose to tolerate it.

Justice Brennan agreed with Justice Stevens' result, but did not agree with his analysis. Instead of distinguishing the earlier cases and presuming congressional intent to tolerate the conflict unless otherwise shown, Justice Brennan held that the legislative histories of the NLRA and the Social Security Act provided sufficient evidence that Congress did not intend to pre-empt states from paying unemployment compensation benefits to strikers. Therefore, he preferred to leave the burden of proof on the party that asserts that Congress intended to tolerate the conflict.

Justice Blackmun, joined by Justice Marshall, also agreed with the conclusion reached by Justice Stevens but disagreed with Justice Stevens' analysis. Like Justice Brennan, they felt that, where a conflict existed with a state act which curtails the free economic relationship of parties to a labor dispute, the state law is pre-empted *unless* there is evidence that Congress intended to tolerate the conflict. In this case, notwithstanding the conflict between the federal and the state law, the legislative histories of the NLRA and the Social Security Act provide sufficient evidence that Congress intended to tolerate this conflict.

Justice Powell, joined by Chief Justice Burger and Justice Stewart, dissented. They held that the

state law distorted the federal labor relations policy of protecting free collective bargaining from state intervention. They did not find a clear legislative intent to tolerate the conflict in this case and therefore they would have held that the state law was pre-empted by the federal law.

Upon the basis of this holding, the defendant asserts that "[s]ix members of the Court agreed that Congress had decided to tolerate any interference by state law with federal labor policy in the area of unemployment compensation."[45] Therefore, the defendant states that this Court can draw only one conclusion from the *New York Telephone* case and that conclusion is that it controls the pre-emption issue before the Court:

"The only conclusion that can be derived from the opinion, as it applies to the federal preemption issue before this Court, is that state law is *not* preempted by federal law in the area of authorizing or prohibiting unemployment insurance benefits to strikers * * *."[46]

The defendant's assertion, however, is overbroad, just as the plaintiffs' assertion was overbroad. In *New York Telephone,* the United States Supreme Court took pains to note that the case did not involve any rights arguably protected by § 7 or § 8 of the NLRA. By so doing, they implicitly noted that a different result or conclusion may be required where a party asserts a § 7 or § 8 NLRA right. Therefore, we reject the defendant's assertion that "this Court should feel safe in concluding that a lesser issue, the denial of unemployment insurance benefits to those who support a strike, will likewise not offend federal labor policy."[47]

---

[45] Defendants-Appellees' Supplemental Brief (1979), p 3.

[46] Defendants-Appellees' Supplemental Brief (1979), p 7.

[47] Defendants-Appellees' Supplemental Brief (1979), p 7.

Instead, we believe it is necessary to review this case in light of its specific facts: first, the plaintiffs allege a conflict between a state law and a federal right protected by § 7 or § 8 of the NLRA; second, the challenged state law disqualifies those who are directly involved in a labor dispute, through financing, from receiving state unemployment benefits. In such a specific case, we must undertake a careful analysis and not merely rely upon distinguishable United States Supreme Court cases.

## C

A careful analysis requires that we apply the two-step analysis used by the United States Supreme Court in *Nash* and *New York Telephone* to the facts of this case. The first step is to identify the allegedly conflicting federal and state laws and to ascertain that there is *in fact* a conflict between the two laws. If we find that a conflict does in fact exist between the federal law and the state law, we must then determine whether Congress intended to tolerate the conflict between the federal law and the state law. In the course of this analysis, we must not forget that the issue raised by the plaintiffs is specific: does the financing disqualification of MESA § 29(8)(a)(ii) which disqualified the plaintiffs for financing the labor dispute which caused their unemployment conflict with the NLRA § 7 and § 8 rights of employees to "assist" their union and, if so, did Congress intend to tolerate such a conflict or is the MESA § 29(8)(a)(ii) financing disqualification pre-empted by the federal constitution's Supremacy Clause?

### 1

The federal right asserted by the plaintiffs is

found in § 7 and § 8 of the NLRA. Section 7 of the NLRA states:

"Employees shall have the right to * * * assist labor organizations * * * and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 USC 157.

Additionally, the plaintiffs assert that the right to assist a labor union and engage in concerted activities is protected by § 8 of the NLRA which makes the violation of § 7 rights an unfair labor practice. 29 USC 158. The NLRA nowhere defines the term "assist." However, it would be inconsistent with the broad statement of rights contained in § 7 of the NLRA to define the term "assist" without including financial assistance. Additionally, such an interpretation would be inconsistent with the legislative history of the NLRA which indicates that the NLRA was intended to encourage union member financial support of labor unions and to prohibit employer financial support of labor unions.[48] Therefore, it is clear that § 7 of the NLRA protects the right of employees to *financially* "assist" their unions and that such protection is within the purpose of the NLRA.

The plaintiffs identify MESA § 29(8)(a)(ii) as the state law in conflict with the federal labor relations statute. MESA § 29(8)(a)(ii) contains a "financing" disqualification which prohibits a claimant who "finances" the labor dispute which causes the claimant's unemployment from receiving unemployment compensation. Such a financing disqualification, according to the plaintiffs, interferes with their federally protected right to assist their labor union. Therefore, the plaintiffs assert

---

[48] H Rep 972, 74th Cong 1st Sess, 16 (1935); 79 Cong Rec 7570, 9684, 9699, 74th Cong 1st Sess (1935).

that MESA § 29(8)(a)(ii) conflicts with the federal relations law as expressed in § 7 and § 8 of the NLRA.

We agree with the plaintiffs that a conflict does in fact exist between the NLRA and the MESA. The conflict is not so great that the MESA prohibits the right to "assist" guaranteed in the NLRA. But the MESA disqualification does affect the exercise of the right to "assist" guaranteed in the NLRA. Therefore, having found that a conflict exists, we must proceed to the second step of this pre-emption analysis.

2

In determining whether Congress intended to tolerate the conflict between § 7 and § 8 of the NLRA and § 29(8)(a)(ii) of the MESA, we must take our cue from the differing opinions of the justices in *New York Telephone*.[49]

a

We begin by determining which party bears the burden of establishing the congressional intent and what congressional intent must be established. As a general rule, the party seeking to uphold the conflicting state law must establish that the Congress intended to tolerate the conflict. However, the United States Supreme Court has recognized exceptions to this rule. In *San Diego Building Trades Council v Garmon*, 359 US 236, 244; 79 S

---

[49] While we look to *New York Telephone* for guidance, we continue to reject the defendants' assertion that it provides controlling precedent for this case. *New York Telephone* involved no § 7 or § 8 NLRA rights, and no majority of the United States Supreme Court found either that Congress intended to tolerate conflicts between § 7 or § 8 of the NLRA and state unemployment compensation laws or that Congress should be presumed to tolerate such conflicts barring evidence to the contrary.

Ct 773; 3 L Ed 2d 775 (1959), the United States Supreme Court held that the burden was upon the party asserting that the challenged state law was pre-empted to show that Congress intended to prohibit the conflict where the state law involves an aspect of labor relations "conduct touch[ing] interests so deeply rooted in local feeling and responsibility that * * * we could not infer that Congress had deprived the States of the power to act."

We hold that the burden is upon the defendant to show that Congress intended to tolerate the conflict caused by the challenged state law; it is not upon the plaintiffs to show that Congress intended to prohibit the conflict caused by the challenged state law. We draw this conclusion from the four opinions in *New York Telephone.* Justice Stevens, joined by Justices White and Rehnquist, in the lead opinion, did not specifically state that the definition of unemployment benefit eligibility was a matter of "local feeling and responsibility," but he did state that it was appropriate to treat such a state law with the deference due to a state law touching upon a matter of local feeling and responsibility:

"It is therefore appropriate to treat New York's statute with the same deference that we have afforded analogous state laws of general applicability that protect interests 'deeply rooted in local feeling and responsibility.' With respect to such laws, we have stated 'that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act.'" *New York Telephone, supra,* pp 539-540.

Justice Brennan found "substance" in Justice Stevens' treatment of the "local feeling and responsibility" exception as applied to this case but did not

specifically adopt it. *New York Telephone,* pp 546, 547. Justice Blackmun, joined by Justice Marshall, specifically refused to adopt Justice Stevens' interpretation of the "deeply rooted in local feeling and responsibility" exception and stated that state statutory definitions of unemployment compensation eligibility did not fall within the "deeply rooted in local feeling and responsibility" exception. *New York Telephone,* pp 550-551. Justice Powell, joined by Chief Justice Burger and Justice Stewart, held that the "deeply rooted in local feeling and responsibility" exception had nothing to do with state unemployment compensation laws because such laws had "nothing in common with the state laws protecting against personal torts or violence to property." *New York Telephone,* p 560. Therefore, a majority of the members of the United States Supreme Court held that a state law defining eligibility for unemployment compensation benefits did not fall within the "deeply rooted in local feeling and responsibility" exception so as to shift the burden to show that Congress intended to pre-empt rather than intended to tolerate the conflict. The defendant therefore bears the burden of showing that Congress intended to tolerate the conflict which exists between § 7 and § 8 of the NLRA and § 29(8)(a)(ii) of the MESA.

b

In evaluating congressional intent concerning the conflict between §§ 7 and 8 of the NLRA and § 29(8)(a)(ii) of the MESA, we must review two federal statutes. First, we must review the language and legislative history of the NLRA from which the plaintiffs claim a federal right. Second, we must review the Social Security Act of 1935 (SSA) which affects the MESA. From these two

sources, we must determine whether Congress intended that "assist[ance]" under the NLRA prohibits a financing disqualification under the MESA.[50]

Congress passed the NLRA on July 5, 1935.[51] Through § 7, it declared the right of employees to "assist" their unions. However, it did not define or explain what it meant by the term "assist" and there was absolutely no discussion of a "financing" disqualification under a state unemployment compensation statute. Such congressional silence is understandable if viewed from the perspective of July, 1935. Only five states had unemployment compensation statutes in July, 1935, and these states split over whether to provide benefits to strikers; Congress made no explicit choice between the statutes when it passed the NLRA.[52] Therefore, the NLRA is silent concerning whether it intended to tolerate a conflict between the NLRA §§ 7 and 8 right to "assist" and a state unemployment compensation law which disqualifies union members who "financed" the strike which caused their unemployment. Consequently, we find no indication in the NLRA that the Congress intended to tolerate the conflict complained of in this case.

However, at the same time that Congress was considering the NLRA, it was also considering the SSA, which it passed on August 14, 1935, several weeks after the NLRA.[53] Unlike the NLRA, the SSA and its surrounding legislative history con-

---

[50] As members of the United States Supreme Court noted in *New York Telephone,* the issue raised in this case could be treated not as a pre-emption issue but rather as a conflict between two federal acts, the NLRA and the Social Security Act. However, they treated it as a pre-emption issue since it was phrased that way and since the analysis was the same regardless of how the issue was phrased. The issue before the Court is whether the Congress intended to tolerate the conflict in either case.

[51] 29 USC 151 *et seq.*

[52] *New York Telephone, supra,* pp 540-541.

[53] Social Security Act of 1935, 49 Stat 620; 42 USC 301 *et seq.*

tain many indications of congressional intent con-
cerning toleration of the conflict challenged in this
case. First, the reports surrounding the passage of
the SSA contain numerous statements that the
SSA leaves the states with great latitude to deter-
mine who is to receive unemployment benefits and
the amount of those benefits. For example, the
Senate report on the SSA said:

"Except for a few standards which are necessary to
render certain that the State unemployment compensa-
" 'The legislature has received, considered, and acted upon such
acts and not merely relief measures, the States are left
free to set up any unemployment compensation system
they wish, without dictation from Washington."[54]

Additionally, the Senate Committee on Economic
Security produced a report on the SSA which was
sent to the President and which became the cor-
nerstone of the SSA. In that report the committee
said:

"The plan for unemployment compensation that we
suggest contemplates that the States shall have broad
freedom to set up the type of unemployment compensa-
tion they wish. We believe that all matters in which
uniformity is not absolutely essential should be left to
the States."[55]

The committee also said that the states should
have wide discretion in determining benefits and
eligibility for benefits:

"Benefits—The States should have freedom in deter-

---

[54] S Rep No 628, 74th Cong, 1st Sess, 13 (1935).

[55] Report of the Committee on Economic Security, as reprinted in
Hearings on S 1130 before the Senate Committee on Finance, 74th
Congress, 1st Sess, p 1326 (1935).

mining their own waiting periods, benefit rates, maximum benefit periods, etc."[56]

The section does not contain any limitation stating that benefits must be paid to persons financing the strike which caused their unemployment. The only conclusion that can be drawn from these materials is that Congress intended to provide the states with very wide discretion and considerable autonomy in establishing and regulating their unemployment compensation systems. This state autonomy has been recognized by the United States Supreme Court in several cases, including *New York Telephone, supra,* p 542, where it was said that "the scheme of the Social Security Act has always allowed the states great latitude in fashioning their own programs." Therefore, it is very clear that the Congress intended the states to have almost complete control over their unemployment compensation programs.

Second, Congress repeatedly debated the issue of paying unemployment benefits to strikers during the course of the larger SSA debate. The emphasis of that debate was not directed toward allowing strikers to receive benefits. Instead, there was considerable support for a provision to prohibit states from paying unemployment benefits to strikers. Those provisions were ultimately excluded from the SSA because it was felt that states should be free to decide the issue for themselves.[57] However, the Congress, in an exercise of its "state-like" authority over the District of Columbia, provided for a disqualification of strikers from receiving unemployment benefits.[58] Therefore, Congress indicated that it did not consider the rights mentioned

[56] *Id.,* p 1327.

[57] *New York Telephone, supra,* p 545.

[58] Act of August 28, 1935, ch 794, § 10(a); 49 Stat 950.

in § 7 of the NLRA involving a right to strike as prohibiting a conflicting disqualifying provision of the "state" unemployment compensation law. While this does not speak specifically to a financing disqualification, it remains relevant to Congress' intent concerning § 7 NLRA rights and state unemployment compensation laws. Additionally, since the Michigan law only disqualifies those who are directly involved in the labor dispute through financing, the MESA essentially only disqualifies "strikers" and is analogous to the Congress' District of Columbia unemployment compensation statute.

Third, the SSA did not mandate that states implement unemployment compensation programs. Rather, it created a system of financial and tax benefits for complying states. However, states were in a position to claim those benefits only if they complied with the SSA which Congress had intentionally written without specific guidance so as to allow states discretion. Therefore, to assist the states in writing acceptable state unemployment compensation laws, the Social Security Board (which was established by the SSA) issued draft bills for use by state legislatures.[59] These bills were not "model" bills because the Congress wanted to leave the states great authority to develop their own unemployment compensation programs without federal pressure, even the limited pressure of a federal "model" bill. The draft bill specifically provided that persons could be disqualified for direct involvement in a labor dispute which caused their unemployment. Section 5(d) of the draft bill states:

"For any week in which it is found by the commission

[59] Social Security Board, Draft Bills for State Unemployment Compensation of Pooled Fund and Employer Reserve Account Types (1936).

that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment or other premises at which he is or was employed, provided that this subsection shall not apply if it is shown to the satisfaction of the commission that: (1) He is not participating in or *financing* or directly interested in the labor dispute * * *; and (2) He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or *financing* or directly interested in the dispute."[60] (Emphasis added.)

The draft bill clearly found a financing disqualification to be consistent with the congressional intent expressed in NLRA §§ 7 and 8. Therefore, it is not without significance that the most pertinent draft bill language is repeated almost verbatim in the MESA.[61]

Fourth, it is relevant in assessing congressional intent concerning toleration of a conflict between the MESA and the NLRA that, during the nearly 50 years that followed the passage of the NLRA and the SSA, many states have passed legislation disqualifying persons who finance the labor dispute which causes their unemployment. Congress has never, in the course of its amendments of the NLRA and the SSA, spoken to this conflict. Therefore, it is logical to assume that Congress intended to tolerate the conflict as it exists.

We find that the above four factors indicate that Congress intended to tolerate the conflict which exists between the NLRA, §§ 7 and 8, and the MESA, § 29(8)(a)(ii). Therefore, we conclude that the NLRA does not pre-empt the MESA and that

---

[60] *Id.,* § 5(d).

[61] MESA § 29(8)(a)(ii) provides: "He is participating in or financing or directly interested in the labor dispute * * *."

the MESA is not invalid as violative of the Supremacy Clause of the federal constitution.

### 3

The plaintiffs also claim that MESA § 29(8)(a)(ii) interferes with the internal decisions of the plaintiffs' union under NLRA § 8. It is clearly not the intent of MESA § 29(8)(a)(ii) to do so. To the extent that a conflict exists, we believe that the Congress intended to tolerate such peripheral effect when it indicated its toleration of state unemployment laws containing financial disqualification clauses. Therefore, as above, we conclude that the NLRA does not pre-empt the MESA and that the MESA is not invalid as violative of the Supremacy Clause of the federal constitution.

### IV

The plaintiffs' final contention is that the board disqualified them in violation of their First Amendment rights of association. However, their argument in support of this contention has two flaws. First, it is outdated since it is based upon the facts of the case as they stood before this Court decided *Baker, supra.* Second, the plaintiffs cite First Amendment freedom of religion cases to support their First Amendment freedom of association argument. The Court can quickly dispose of both arguments.

The plaintiffs' reliance upon outdated facts results from their adoption of the freedom of association argument in the 1977 amicus brief of the United Steelworkers.[62] At that time, the appeal board had applied the financing disqualification of MESA § 29(8)(a)(ii) to any payment of non-ordinary

[62] Plaintiffs-Appellants' Brief, p 55.

strike fund dues without consideration of whether a meaningful connection existed between the financing and the labor dispute which caused the claimant's unemployment. Therefore, the plaintiffs, through the United Steelworkers amicus brief, argue that the statutory disqualification "as *interpreted and applied*" by the appeal board and the Court of Appeals has no rational connection to the state interest sought to be achieved by the financial disqualification section, the disqualification of persons who are not "involuntarily" unemployed because they financed the labor dispute which caused their unemployment.[63] However, they did not argue that MESA § 29(8)(a)(ii) was unconstitutional on its face but, rather, acknowledged that "Section 29(8)(a)(ii) *as written* satisfied the test of constitutionality."[64] They made this acknowledgment because they correctly recognized that this case involves "regulation in the social and economic field."[65] Because of this, the state needed only a rational basis for the "legislative classification made in Section 29(8)(a)(ii)" to defeat their freedom of association challenge and such a rational basis clearly existed in this case.[66] Therefore, the plaintiffs, through the adoption of the United Steelworkers amicus brief, merely argue for an interpretation of the MESA, § 29(8)(a)(ii), which makes the financial disqualification compatible with the general purpose of the MESA, which only disqualifies those whose financing of the labor dispute which caused their unemployment made their unemployment "voluntary" under the statute. This the Court has already done by remanding the case to the review board and requiring a

---

[63] United Steelworkers Amicus Brief, p 7.

[64] United Steelworkers Amicus Brief, p 7.

[65] United Steelworkers Amicus Brief, p 7.

[66] United Steelworkers Amicus Brief, p 7.

meaningful connection between the financing and the labor dispute which caused the claimant's unemployment. Having interpreted the MESA financial disqualification more narrowly, there is no longer any risk that it violates the First Amendment freedom of association by "needlessly burden[ing] unionization."[67] Instead, MESA § 29(8)(a)(ii) is constitutional as written and as applied. As the plaintiffs note in their adopted brief, it is well-settled law "under *Dandridge [v Williams,* 397 US 471; 90 S Ct 1153; 25 L Ed 2d 491 (1970)] * * * that the State of Michigan can condition its grant of unemployment compensation benefits so as to disqualify those who knowingly finance the labor dispute which causes their unemployment."[68] Therefore, the statute having been interpreted narrowly and the plaintiffs having recognized the constitutional validity of the MESA, § 29(8)(a)(ii), as written, this argument provides no basis for relief.

The plaintiffs' second freedom of association argument is that the state, in disbursing unemployment benefits, may not put claimants to a "hard choice." In support of this argument, the plaintiffs cite two cases: *Sherbert v Verner,* 374 US 398; 83 S Ct 1790; 10 L Ed 2d 965 (1963), and *Thomas v Review Board of the Indiana Employment Security Division,* 450 US 707; 101 S Ct 1425; 67 L Ed 2d 624 (1981). While both cases involve claimants for unemployment benefits who raise First Amendment objections to their disqualification from such benefits, neither case involves First Amendment freedom of association. Instead, both cases involve claimants who either lost or left employment because it conflicted with their religious beliefs. As

---

[67] United Steelworkers Amicus Brief, p 8.

[68] United Steelworkers Amicus Brief, p 8.

such, both cases involve First Amendment freedom of religion. In this case, no plaintiff has asserted a violation of his freedom of religion. Therefore, since freedom of religion has traditionally been treated very differently from economic and social freedom of association, these cases are not relevant to the issue raised by the plaintiffs and provide no basis for relief.

Additionally, we note another reason for rejecting the plaintiffs' First Amendment freedom of association argument. The plaintiffs did not present any evidence that any one of them was dissuaded from exercising his First Amendment right or even that any of them considered the MESA § 29(8)(a)(ii) financial disqualification as impinging upon their First Amendment rights. Therefore, there is no factual basis upon which the Court could grant any relief.

Therefore, finding neither of the plaintiffs' First Amendment freedom of association arguments applicable to this case as it presently exists, we find no violation of the plaintiffs' First Amendment freedom of association rights.

## V

The Board of Review properly held that the plaintiffs were disqualified from receiving unemployment benefits by MESA § 29(8)(a)(ii). The plaintiffs financed the labor dispute which caused their unemployment and there was a meaningful connection between the plaintiffs' financing and the labor dispute which caused their unemployment. MESA § 29(8)(a)(ii), as written and applied, is constitutional. It violates neither the federal constitution's Supremacy Clause nor the First Amendment to the federal constitution.

The decision of the Board of Review is affirmed.

BRICKLEY and CAVANAGH, JJ., concurred with RYAN, J.

WILLIAMS, C.J. I concur with most of the rationale of my brother RYAN's opinion, but not necessarily with the conclusion. I dissent, however, from that part of his opinion found in Part II(C)(2)(b), "Third," establishing an accounting principle for considering "the effect of the 'emergency' dues upon the resources of the union allocated to supporting labor disputes" *ante,* p 504. The accounting principle I disagree with is stated *ante,* p 505, as follows:

"As applied to the UAW's SIF, which is composed of payments from both regular and emergency sources, payments from the fund should be considered to be composed of the same percentage of regular dues and emergency dues as the larger fund."

On the surface, as Justice RYAN writes, such an approach seems fair and logical. However, the fact of the matter is that, if this formula is applied, there will always remain a percentage of the commingled fund that relates to the "emergency" dues until the end of time unless the fund drops to zero in the interim. This is neither fair nor, I am sure, intended by the Legislature.

As a consequence, I would adopt a Last-In-First-Out (LIFO) formula for three reasons. First, the LIFO formula would relate the voting and contribution of the "emergency" dues more proximately to the distribution of an equivalent amount of money distributed in strike benefits subject to triggering disqualification from unemployment compensation than either the Justice RYAN formula or the First-In-First-Out (FIFO) formula. Second, the LIFO formula would not inflate the dura-

tion of "emergency" dues payments subject to disqualification by the totally irrelevant factor of the size of the prior properly constituted strike fund as the Justice RYAN formula does. For example, under the Justice RYAN formula if there were a prior strike fund equal to the size of the "emergency" dues payments, the disqualification would last twice as long (during the payment of twice as many strike benefit dollars) as it would if there had been no strike fund. This has the curious effect of increasing exposure to disqualification in inverse order to the comparative amount of "emergency" dues. Third, the LIFO formula does not perpetually taint the strike fund as the formula Justice RYAN has adopted would do. When the last cent of "emergency" dues is spent, there would no longer be the possibility of a financing disqualification.

In passing, the other discussed formula, the FIFO formula is not as fair as the LIFO formula. To begin with, it requires the payment of strike benefits first out of moneys deposited in the fund prior to the commingling of the "emergency" dues. This means the payment of strike funds would be made out of the least proximately concerned moneys. Second, if the strike fund were large enough, the emergency might pass without the "emergency" dues being touched. This could also mean that the "emergency" dues would be paid out at a later date when they would disqualify unreasonably or relieve the "emergency" dues from ever disqualifying. Neither alternative would seem to be what the Legislature had in mind.

In conclusion, I would remand this matter to the Board of Review to determine whether, using a LIFO formula, any amount of "emergency" funds beyond a *de minimis* amount, actually financed strike benefits for the striking workers in the GM

plants supplying plaintiffs' plants. If there were no such funds, benefits should be paid. If there were such funds, there would be disqualification pursuant to Justice RYAN's opinion.

LEVIN, J., concurred with WILLIAMS, C.J.

BOYLE, J. I concur with Chief Justice WILLIAMS as to the accounting formula that should be applied to determine whether plaintiffs were properly disqualified from receiving unemployment benefits for "financing" the labor dispute which caused their unemployment. Because the Court has adopted "temporal proximity" as a factor to be considered in determining whether there was a "meaningful connection" between the plaintiffs' emergency dues payments and the labor dispute that caused their unemployment, I agree with Chief Justice WILLIAMS that the LIFO formula provides the fairest[1] means of evaluating the issue.

KAVANAGH, J., took no part in the decision of this case.

---

[1] As opposed to either the FIFO or Justice RYAN's "proportionality" formulae.